[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 887 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 888 
SouthTrust Bank ("the Bank") appeals from a summary judgment in favor of Jones, Morrison, Womack Dearing, P.C.; Stokes, Clinton, Fleming Sherling; Stokes Clinton, P.C.;[1] and Paul Clinton (hereinafter sometimes referred to collectively as "the lawyers") in a third-party We legal-malpractice action. We reverse the Jo summary judgments and remand the cause to the Mobile Circuit Court for further proceedings.
The undisputed facts of this case reveal the following: In 1993, the Bank issued a business credit card to LaCoste Construction Company, Inc. ("LCCI"), located in mi Mobile, Alabama. LCCI authorized nine in of its employees, including Brewton Neal Greene, to use the credit card. None of the nine employees, including Greene, was a guarantor of the credit card indebtedness, and none was personally liable for any of the charges made on the credit card. When LCCI failed to make payments on its credit-card account, the Bank employed the Atlanta, Georgia, law firm of Jones, Morrison, Womack 
Dearing, P.C. ("the Jones, Morrison firm"), to collect the debt. The Bank sent the Jones, Morrison firm its file on the LCCI account. The file included a guaranty agreement that named LCCI and Neal Greene as "borrowers" and that was signed by Vincent D. LaCoste as "guarantor."
Upon receiving the LCCI collection file from the Bank, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote a letter on August 9,1999, to Sandra Nash, an employee in the Bank's recovery department, inquiring as follows:
 "Pursuant to 3/our note, the above Company has a personal guarantee. Do we have a guarantee for all nine individual[s] that are signed on the individual accounts or do we just have a personal guarantee on Vincent D. LaCoste? Please advise."
On August 23, 1999, Sezette Spivey, a legal-accounts representative for the Bank, wrote to Bill Morrison, an attorney in the Jones, Morrison firm, as follows:
 "In response to the letter from your office dated August 9, 1999: Attached you will find a copy of the Guaranty of Payment. If you have any questions, please feel free to call."
A document entitled "Guaranty of Payment" enclosed with Spivey's letter states, in pertinent part, the following:
 "To induce Bank to make a loan or extend credit or make other financial products or services available to LaCoste Construction Co., Inc. — Neal Greene (as hereinafter further defined, called the `Borrower'), Guarantor hereby agrees with Bank as follows:
 "1. This Guaranty is made for the purpose of securing to Borrower, at Guarantor's request, one or more loans or extensions of credit with . . . Bank. . . . All such loans or other financial products or services now or hereafter provided by Bank to Borrower, and all extensions or renewals of debts or other obligations now or at any time hereafter owing by Borrower to Bank, are made by Bank in reliance on this Guaranty. . . .
 "2. Guarantor jointly and severally if more than one, hereby unconditionally guarantees to Bank the payment and performance by Borrower of all the Guaranteed Obligations (as hereinafter defined). . . ." *Page 890 
LaCoste's signature on the guaranty agreement is not accompanied by a typewritten version of his name.[2] Spivey knew that the signature was that of LaCoste, but she did not inform the Jones, Morrison firm of that fact. She also did not send the Jones, Morrison firm a copy of the other guaranty agreements, each bearing the name of a different LCCI employee as a "borrower" but containing the signature of the sole guarantor, Vincent D. LaCoste.
The Jones, Morrison firm associated the Mobile firm of Stokes, Clinton, Fleming Sherling ("the Stokes, Clinton firm") to file suit on the debt, and it provided that firm with a copy of the Bank's file, including the guaranty agreement signed by Vincent LaCoste and bearing Neal Greene's name as a "borrower." The Stokes, Clinton firm prepared a document entitled "Statement of Account/Sworn Statement of Claim" that identified the Bank as "creditor" and LCCI and Greene as "debtor" (singular). The Stokes, Clinton firm sent the statement to the Jones, Morrison firm on January 19, 2000; the Jones, Morrison firm forwarded the statement to Nancy Tray, a supervisor in the Bank's recovery department, with the following cover letter from Linda Seymour, who identified herself as a "legal representative" of the Jones, Morrison firm:
 "Enclosed please find documents needed to proceed with legal actions. At your earliest convenience please sign, notarize and send back to our office. If there are any questions regarding this matter, please direct all phone calls, faxes, letters, etc. to my attention."
Tray signed the document and gave it to Spivey to return to the Jones, Morrison firm. Spivey testified that she saw Greene's name on the statement but that she did not think it meant that Greene would be a defendant in any lawsuit filed on behalf of the bank to collect the debt.
On March 3, 2000, the Stokes, Clinton firm filed a complaint in the Mobile Circuit Court on behalf of the Bank against LCCI and Neal Greene, jointly and individually, but not against Vincent D. LaCoste, seeking a total indebtedness of $50,432.55, plus costs. The complaint contained instructions requesting service on both defendants at 3463 LaCoste Road in Mobile. On March 16, 2000, the service of Greene was returned "not found," with a sheriffs notation that Greene was "no longer employed" by LCCI. Neither the summons and complaint nor any other motions and pleadings were sent to the Bank.
On May 10, 2000, the Bank learned that Vincent D. LaCoste had filed Chapter 7 bankruptcy proceedings, and it instructed the Jones, Morrison firm to "close the file" on the LCCI collection matter because of LaCoste's personal bankruptcy. On May 10 and 11, 2000, Bill Jones, an employee of the Jones, Morrison firm, noted on the firm's collection history that the file should be closed. On May 18, Spivey made a similar notation on the Bank's LCCI collection file. On May 31, 2000, Jack Fogelman, the collection manager at the Jones, Morrison firm, entered a "close-file" memorandum on the firm's accounts. The close-file instruction, however, was not communicated to the Stokes, Clinton firm.
On August 14, 2000, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote the following letter to Drew Dorrance in the Bank's legal-recovery department:
 "Our co-counsel has been unable to locate Neal Greene for service. Do you *Page 891 
wish to serve by publication? The cost is approximately $120.00. Please advise."
Spivey testified that the letter was routed to her; she said that on August 23, 2000, she telephoned Jack Fogelman at the Jones, Morrison firm and inquired why any activity was occurring on a file that should have been closed. She did not specifically question why co-counsel was attempting to serve Greene.
Meanwhile, on August 15, 2000, Paul Clinton of the Stokes, Clinton firm had filed a motion for service by publication on Greene, with a supporting affidavit averring that he had personal knowledge of the fact that Greene had been avoiding service, that Greene had been absent from his residence for more than 30 days since the filing of the complaint, that Greene could not be located, and that service could not be perfected on Greene by any method other than by publication. The Mobile Circuit Court granted the motion on August 18, 2000.
On October 18, 2000, Saundra Morrison, the office manager at the Jones, Morrison firm, wrote the following letter, marked "Att'n: Meg" to the Stokes, Clinton firm, referencing the "[LCCI] account balance with SouthTrust Bank":
 "Please be advised our client has requested that we close the above debtors file. They do not have adequate documentation to proceed on this case. If you have any questions, please advise."
The records of the Stokes, Clinton firm indicate that it received the letter from the Jones, Morrison firm on November 22, 2000. On October 24, 2000, when Greene had not answered or otherwise appeared in the Bank's action, Clinton requested the entry of default against Greene. On October 30, 2000, the Mobile Circuit Court entered a default judgment for the Bank against Greene in the amount of $50,702.97. The Stokes, Clinton firm recorded the judgment against Green on November 29, 2000.
At all times material to the Bank's lawsuit against Greene, Greene was listed in the Mobile telephone directory as "B. Neal Greene" residing at 6602 Cherry Pointe Court in Mobile. On February 21, 2001, Greene was attempting to close a sale of real property when he learned that there was a judgment recorded against him in favor of the Bank. Greene contacted a Bank official who investigated the matter, learned that there was no basis for a judgment against Greene, and instructed the Stokes, Clinton firm to cancel the judgment immediately. The judgment was subsequently set aside, and a summary judgment was entered in favor of Greene on May 11, 2001.
On June 26, 2001, Greene sued the Bank, but not the lawyers, alleging claims of malicious prosecution, abuse of process, negligence, wantonness, and outrage. On August 28, 2001, counsel for the Bank wrote a letter to Ben Stokes of the Stokes, Clinton firm, stating, in pertinent part:
 "After reviewing a Bank file and the court file in the underlying case [South-Trust Bank v. LCCI and' Neal Greene], it seems apparent to us that, if there is liability on the part of SouthTrust (which we have denied), then the ultimate responsibility for that obligation should fall upon the attorneys representing the Bank in suing Mr. Greene and taking a judgment against him. . . . [I]t seems that we have no alternative but to name your firm, and possibly one or more attorneys in the firm, as third-party defendants for indemnity purposes."
In April 2002, the Bank filed a motion for a mediation, allowing the lawyers to participate without being named as third-party *Page 892 
defendants in the action. That motion was granted; the record does not reveal the outcome of the mediation or whether the lawyers participated. On May 31, 2002, the Bank filed a third-party complaint against the lawyers, alleging claims under the Alabama Legal Services Liability Act ("ALSLA"), § 6-5-570 et seq., Ala. Code 1975, and seeking indemnity for any liability that the Bank might have to Greene.
Specifically, the Bank alleged (1) that the Jones, Morrison firm had negligently or recklessly breached its duty to examine the documents provided to it by the Bank in order to determine the proper party to sue on the credit-card debt, thereby wrongly causing Greene to be made a defendant when there was no basis for pursuing claims against him individually for the corporate debt of his employer, (2) that the Stokes, Clinton firm had negligently or recklessly caused Greene to be served by publication when, the Bank claimed, a reasonable effort to determine Greene's home address would have resulted in personal service on Greene, thereby enabling Greene to appear, to argue for, and to obtain a dismissal of the Bank's lawsuit against him, and (3) that after May 10, 2000, when the Bank instructed the Jones, Morrison firm to "close the file" on the LCCI collection matter, the lawyers breached their duty to the Bank by not immediately dismissing the lawsuit against LCCI and Greene.
The lawyers filed motions to dismiss the Bank's third-party complaint, alleging, among other things, that the statutory limitations period for bringing a claim pursuant to the ALSLA had expired before the Bank filed its third-party complaint against the lawyers. The trial court denied the motions to dismiss.
In May 2003, the trial court again ordered mediation, and the parties agreed to hold a mediation on September 24, 2003. The date of the mediation was postponed to October 1, 2003. On July 25, 2003, the circuit court entered a summary judgment for the Bank on all counts of Greene's complaint except for the malicious prosecution claim. The lawyers moved for a summary judgment on the Bank's third-party claims and attached supporting briefs, arguing that the Bank was not, as a matter of law, entitled to indemnity from them. The lawyers asserted that, even assuming that they were negligent in suing, serving, and recording a judgment against Greene, the Bank was also negligent in commencing the suit without telling them that Greene was not a guarantor of LCCI's debt. Accordingly, the lawyers asserted that the parties were joint tortfeasors between whom there could be no right of indemnity. The Bank moved for a summary judgment on its third-party claims against the lawyers, and Greene moved for a summary judgment on his malicious-prosecution claim against the Bank.
Following a hearing at which the trial court heard arguments of the parties, the trial court, on September 24, 2003, entered a summary judgment for the lawyers on the Bank's third-party complaint, and denied the motions by the Bank and Greene for a summary judgment. The court did not state the basis for its rulings. Shortly thereafter, the lawyers informed the mediator that they would not attend the mediation. One month later, on the eve of the trial scheduled for Greene's malicious-prosecution action against the Bank, the Bank settled with Greene for $325,000. The circuit court subsequently dismissed Greene's complaint. The Bank sought reimbursement from the lawyers for two-thirds of the amount it had paid to settle Greene's claim, and the lawyers refused to *Page 893 
reimburse the Bank for any portion of the settlement with Greene.
The Bank appealed to the Alabama Supreme Court from the summary judgment in favor of the lawyers on the third-party claims. The supreme court transferred the appeal to this court, pursuant to § 12-2-7(6), Ala. Code 1975.
 The Motions to Dismiss the Appeal
The lawyers have filed motions to dismiss the appeal on the basis that it is moot. Relying on Allstate Insurance Co.v. Amerisure Insurance Cos., 603 So.2d 961 (Ala. 1992) ("Amerisure II"), the lawyers argue that the Bank rendered this appeal moot by settling Greene's claim without attempting to preserve its indemnity claims against the lawyers. Careful analysis of the Amerisure II
decision indicates that it is inapplicable here and that the lawyers' motions to dismiss the appeal are due to be denied.
In Amerisure II, Morris Sherrill was driving his pickup truck and towing a trailer owned by his employer, Wadsworth Contractors, Inc. The trailer came unhitched from the truck and struck the vehicle of Fred Demo. Allstate Insurance Company, Sherrill's insurer, paid Demo's property-damage claim. Demo filed a personal-injury action against Sherrill and Wadsworth Contractors. Allstate filed a separate declaratory-judgment action against Amerisure Insurance Companies, Wadsworth Contractor's insurer, arguing that it was not obligated to defend or indemnify Sherrill in Demo's personal-injury suit. Amerisure answered, contending that its coverage for Wadsworth Contractors was primary but that its coverage for Sherrill was secondary to Allstate's. The trial court entered a summary judgment for Allstate, holding that Amerisure had primary coverage for the claims against Sherrill and that Allstate had no duty to defend or indemnify Sherrill. Amerisure appealed that judgment to the Alabama Supreme Court. While the appeal was pending, Amerisure settled with Demo for the claims against Sherrill, Wadsworth Contractors, and Amerisure. Shortly thereafter, the supreme court, holding that Allstate was obligated to provide coverage to Sherrill, reversed the summary judgment in favor of Allstate in the declaratory-judgment action. See AmerisureIns. Cos. v. Allstate Ins. Co., 582 So.2d 1100 (Ala. 1991) ("Amerisure I"). The supreme court did not address the question of which insurer had primary coverage.
When the case was returned to the trial court on remand, Amerisure filed a counterclaim against Allstate, alleging that it was entitled to reimbursement for the sums it had paid in the settlement. The trial court entered a summary judgment for Amerisure, and Allstate appealed. On appeal, Allstate argued that Amerisure had failed to prove that it was entitled to reimbursement under either of two theories: an implied contract of indemnity or equitable subrogation. Allstate contended that Amerisure had forfeited its right to proceed against Allstate (1) by failing to notify Allstate that it intended to seek reimbursement from Allstate, and (2) by failing either to postpone the settlement until the supreme court's opinion in the appeal of the declaratory-judgment action was released or to seek a continuance of the trial on the underlying liability claims. The supreme court agreed with Allstate's contentions; the court stated:
 "The record is devoid of any notice that Amerisure intended to pursue a claim for reimbursement against Allstate. Amerisure's settlement agreement included the release of Allstate's insured from all liability, but did not mention Amerisure's claim for reimbursement in the event that Allstate's declaratory judgment was reversed. It would be *Page 894 
unjust, and possibly a violation of due process, to subject Allstate to the terms of a settlement to which it did not consent, at least not with any view toward its own liability, even if it implicitly consented on behalf of its insured. Amerisure settled at a time when there was a declaratory judgment holding that Allstate's policy did not provide coverage for this accident. Amerisure effectively mooted its appeal by settling as it did without attempting to preserve its right to proceed against Allstate on the settlement."
Amerisure II, 603 So.2d at 966.
Amerisure II does not apply to the situation between the Bank and the lawyers in this case for at least two reasons. First, Amerisure II is not an indemnity case; rather, it is a subrogation case. Amerisure settled on behalf of both Wadsworth Contractors (its insured) and Sherrill (Allstate's insured). The Alabama Supreme Court quoted a portion of Sherrill's policy contract with Allstate, which
 "include[d] the following prohibition of the insured's voluntary and unilateral settlements or payments: `[Allstate] can't be obligated by you voluntarily making any payments or taking other actions except as specified in this policy.'"
Amerisure II, 603 So.2d at 966. The supreme court concluded that "[b]ecause Sherrill could not recover from Allstate any payments that he might make voluntarily, neither can Amerisure." Id. (citing Lady CorinneTrawlers, Inc. v. Zurich Ins. Co., 507 So.2d 915, 918
(Ala. 1987), for the proposition that "`[t]he right to the insurer's subrogation is dependent upon its liability to [the insured], which in turn is dependent upon [the tort-feasor's] liability to [the insured]'" (emphasis added) (quoting Barnes v. Tarver, 360 So.2d 953, 956
(Ala. 1978))).
Three years after it decided Amerisure II, the Alabama Supreme Court recognized in another case that theAmerisure II decision was "focus[ed] on the doctrine of subrogation." Mt. Airy Ins. Co. v. Doe Law Firm,668 So.2d 534, 537 (Ala. 1995) (emphasis added; footnote omitted). The supreme court explained that its decision inAmerisure II had dealt with "a claim by Amerisure that it should recover from Allstate the money it had paid to settle a third party's claim against an insured, when at the time Amerisure paid the claim it was disputed as to which of the two insurers owed the primary coverage." Mt.Airy, 668 So.2d at 537 n. 1. Although the supreme court discussed indemnity in Amerisure II,[3] it did so, the Mt. Airy court noted, because "Amerisure phrased its claim against Allstate as one for indemnity orequitable subrogation." Mt. Airy, 668 So.2d at 537 n. 1. See also Allstate Ins. Co. v. Brantley, 867 F.Supp. 1004, 1008 (M.D.Ala.1994) (noting that the "reasoning behind the Alabama Supreme Court's holding in [AmerisureII]" was similar to the rationale underlying cases such as Lambert v. State Farm Mutual Automobile InsuranceCo., 576 So.2d 160 (Ala. 1991), holding that an insured has a duty to notify his insurance carrier of a proposed *Page 895 
settlement with an uninsured motorist in order "to . . . protect the carrier's rights to subrogation against the tortfeasor, and . . . to protect the carrier from possible collusion between its insured and the tortfeasor's liability insurer at the expense of the carrier" (emphasis added)).
Amerisure II does not apply to the situation between the Bank and the lawyers in this case for a second reason: irrespective of the supreme court's analytical framework (the court; alternately used the terms "indemnity," "equitable subrogation," and "reimbursement" to describe the basis for Amerisure's counterclaim against Allstate), it is clear that the court considered it pivotal that Amerisure had failed to notify Allstate that it intended to look to Allstate for recoupment of what it had paid in settlement. The court stated, "The record is devoid of any notice that Amerisure intended to pursue a claim for reimbursement against Allstate." Amerisure II, 603 So.2d at 966 (emphasis added). In the present case, there is simply no basis for arguing that the lawyers were unaware that the Bank was seeking indemnity from them for any liability it might have to Greene.
On August 28, 2001, counsel for the Bank wrote the following letter to the Stokes, Clinton firm clearly notifying the lawyers in that firm that it considered them "ultimate[ly] responsible]" for any liability the Bank had to Greene:
 "After reviewing a Bank file and the court file in the underlying case [South-Trust Bank v. LCCI and Neal Greene], it seems apparent to us that, if there is liability on the part of SouthTrust (which we have denied), then the ultimate responsibility for that obligation should fall upon the attorneys representing the Bank in suing Mr. Greene and taking a judgment against him. . . . [I]t seems that we have no alternative but to name your firm, and possibly one or more attorneys in the firm, as third-party defendants for indemnity purposes."
In addition, the Bank filed a motion in April 2002 for a mediation allowing the lawyers to participate in Greene's action against the Bank without being named as third-party defendants. Finally, on May 31, 2002, the Bank filed a third-party complaint against the lawyers, alleging claims under the ALSLA and seeking indemnity for any liability that the Bank might have to Greene.
We hold that Amerisure II is not authority for precluding the Bank from pursuing its third-party claims against the lawyers. The lawyers' motions to dismiss the appeal as moot are denied. We now address the propriety of the summary judgments in favor of the lawyers.
 Standard of Review
Appellate review of a summary judgment is de novo. Exparte Ballew, 771 So.2d 1040 (Ala. 2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); see Ex parte General MotorsCorp., 769 So.2d 903, 909 (Ala. 1999); and Lee v. Cityof Gadsden, 592 So.2d 1036, 1038 (Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038
(footnote omitted). "[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the *Page 896 
fact sought to be proved." West v. Founders LifeAssurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989);see Ala. Code 1975, § 12-21-12(d). Because the trial court did not specify the basis for its summary judgment in favor of the lawyers, we must affirm the judgment if there is any legal basis for upholding it.
 Statute of Limitations — ALSLA Claims
Because the trial court denied the lawyers' motions to dismiss alleging that the Bank's ALSLA claims were time-barred, it is unlikely that the trial court entered the summary judgment on the Bank's third-party claims on that basis. Nevertheless, because this court "`will affirm the judgment appealed from if [it is] supported on any valid legal ground,'" Smith v. Equifax Services, Inc.,537 So.2d 463, 465 (Ala. 1988) (quoting Tucker v. Nichols,431 So.2d 1263, 1265 (Ala. 1983)), we have reviewed the Bank's claims against the lawyers in light of the applicable statutory limitations period set forth in § 6-5-574, Ala. Code 1975, a part of the ALSLA, as well as the holding of our supreme court in Ex parte Panell, 756 So.2d 862
(Ala. 1999) (plurality opinion). Section 6-5-574 provides, in pertinent part, that ALSLA actions must be commenced "within two years after the act or omission or failure giving rise to the claim."
In Panell, an attorney allegedly accepted a settlement offer on September 22, 1993, without his client's approval. The trial court entered a notation on the case action summary sheet on January 31,1994, stating that the case had been dismissed, and it entered a judgment dismissing the case on August 18, 1994. The client brought a legal-malpractice action against the attorney on January 30, 1996. Concluding that the client's malpractice claim accrued on September 23, 1993, rather than either of the later dates, our supreme court held that "a legal-malpractice cause of action accrues, and the statute-of-limitations period begins to run, when `the act or omission or failure giving rise to the claim' occurs, and not when the client first suffers actual damage." 756 So.2d at 868 (footnote omitted). The court stated, however, that the statute of limitations could not possibly expire before the client had a right to commence a legal-malpractice action. The court explained:
 "We do not intend . . . `to sever the connection between the act or omission and the cause of action, that is, to authorize a malpractice action regardless of whether the act or omission of which the client complains ever ripens to a cause of action.' . . . [U]nder our interpretation today, it is not possible that the limitations period could expire before the client had a right to commence and maintain a legal-malpractice action. The occurrence of the tortious act or omission both gives rise to the client's claim and triggers the running of the limitations period.
 "As the Supreme Court of the United States explained in Wilcox v. Executors of Plummer, 29 U.S. (4 Pet.) 172, [182,] 7 L.Ed. 821, [824] (1830).
 "`When might this action have been instituted, is the question; for from that time the statute [of limitations] must run.'"
Ex parte Panell, 756 So.2d at 868 n. 1 (emphasis added).[4] In the present case, the question is: When might the Bank *Page 897 
have first been able to institute an action alleging legal malpractice?
In Panell, the supreme court decided that the client could sue the lawyer the day after the lawyer agreed to settle the case because the client's claim accrued contemporaneously with the act or omission of the attorney. That is, in Panell the act or omission of the attorney was both what gave rise to the client's claim and what triggered the running of the statute of limitations. Here, however, because of the elements of a malicious-prosecution cause of action, the existence of any malpractice claim the Bank might have had against the lawyers was contingent upon the Bank's potential liability to Greene for malicious prosecution. It is well settled that a plaintiff has no malicious-prosecution claim unless the underlying proceeding against him as a defendant ended in his favor.Barrett v. Mobile Home Transp., Inc. v. McGugin,530 So.2d 730 (Ala. 1988). Therefore, in the present case, the acts and omissions of the lawyers were only part of the occurrence that gave rise to the Bank's malpractice claim and triggered the running of the statute of limitations.
A malicious-prosecution cause of action is the classic example of a claim that is "linked to a jural event" — one in which all the acts giving rise to the claim have been completed but the claim is nonetheless delayed pending the outcome of another judicial proceeding. See Lombardo v.County of Nassau, 6 Misc.3d 836, 838, 791 N.Y.S.2d 292,295 (2004).
Rule 14, Ala. R. Civ. P., was designed to address the practical difficulties inherent in contingent claims like the Bank's claims against the lawyers.
 "Indeed, Rule 14, Ala. R. Civ. P., and its statutory predecessor, Tit. 7, § 259, Ala. Code 1940 (Recompiled 1958), were adopted to prevent third-party claims, which are contingent on the outcome of original actions against third-party plaintiffs, from being dismissed as pre-mature when brought in the same proceeding as the original action."
Ex parte Stonebrook Dev., L.L.C., 854 So.2d 584,590-91 (Ala. 2003) (first emphasis added). In StonebrookDevelopment, a contractor sued a real-estate developer, alleging nonpayment on an account and work and labor performed. The developer counterelaimed, alleging breach of warranty and breach of contract. The contractor filed a third-party complaint for indemnity against the architects, alleging that the architects' negligence had caused the contractor to be delayed in completing the project and seeking reimbursement for any liability the contractor might have on the developer's breach-of-warranty and breach-of-contract claims. The trial court dismissed the third-party indemnity claim, ruling that it had been filed after the statutory limitations period had run. The Court of Civil Appeals reversed the dismissal, and the supreme court affirmed, quoting at length from Judge Murdock's opinion for the Court of Civil Appeals. The supreme court explained the triggering mechanism for an indemnity claim:
 "This Court addressed the issue of when a cause of action for indemnification occurs so as to trigger the running of the statutory limitations period in American Commercial Barge Line Co, v. Roush, 793 So.2d 726, 729-30 (Ala. 2000) (noting that in an action seeking indemnification the limitations period does not begin to run until liability has become fixed); see also Alabama Kraft Co. v. Southeast Alabama Gas Dist, 569 So.2d 697, 700 (Ala. 1990) ('a right to indemnity does not arise . . . until one acting as surety satisfies his principal's obligation, or until a master or principal pays damages arising from his servant's *Page 898 
or agent's negligent or fraudulent acts')."
Stonebrook Development, 854 So.2d at 591. InStonebrook Development, the architects argued that the Court of Civil Appeals "should have applied the `occurrence rule' adopted . . . in Ex parte Panell,756 So.2d 862 (Ala. 1999), and that by not doing so, it ha[d] incorrectly decided th[e] issue." Id. The supreme court answered that argument as follows:
 "We disagree. In Panell, the plaintiff sought damages for legal malpractice; the case ha[d] nothing to do with the law of indemnity. On that ground alone, Panell is distinguishable."
Id.
The present case does have something "to do with the law of indemnity." Id. The Bank alleged claims under the ALSLA and sought indemnity for any liability that the Bank might have to Greene. In a situation very similar to that of the present case, an Ohio appellate court explained that a client's third-party complaint alleging legal malpractice "closely approximate[d] an action for indemnification."Torok v. Taylor (No. 51611, Jan. 2, 1997) (Ohio Ct.App. 1987) (unreported decision).
In Torok, Timothy Taylor represented Elaine Torok in a postdivorce contempt action against Raymond Torok, her former husband — an action that resulted in Mr. Torok's being incarcerated pursuant to an affidavit filed by Taylor. Mr. Torok later sued his former wife, asserting a claim of malicious prosecution based on what he contended was a fraudulent affidavit. Mrs. Torok filed a third-party complaint against Taylor, alleging a claim of legal malpractice. The trial court entered a judgment for Mrs. Torok, and Taylor appealed. On appeal, Taylor argued, among other things, that the third-party complaint against him was procedurally improper because Rule 14 of the Ohio Rules of Civil Procedure (which is substantially identical to Rule 14 of the Alabama Rules of Civil Procedure) "never allows for third party complaints based upon separate causes of action."
The Ohio court's resolution of that question sheds light on how the Bank's malpractice claim should be analyzed in this case. The Ohio court explained:
 "While a third-party complaint may not introduce a totally independent cause of action, `the foundation of such a complaint must be that the third party is or may be liable to the defendant for all or part of the plaintiff's claim against the defendant.' State Farm v. Charlton
(1974), 41 Ohio App.2d 107.
 "Civ. R. 14 is most commonly employed to join a third party who is liable to the defendant on a theory of contribution or indemnification. However the language of the rule is not so limited as to foreclose other types of claims. It is well settled that Fed. Civ. R. 14, whose language is quite similar, does not require `an identity of claims or even that the claims rest on the same theory.' American Fidelity and Casualty Company, Inc. v. Greyhound Corp. (5th Cir. 1956), 232 F.2d 89, 92. Rather, the focus of the rule is whether the third-party claim arose from the transaction or occurrence which is the subject matter of the primary claim. . . .
 ". . . .
 "In the instant action, the third-party complaint alleges legal malpractice, a cause of action separate and distinct from malicious prosecution. However, the occurrence which forms the subject matter of each claim is identical. Both suits center on the circumstances surrounding Mrs. Torok's decision to sign the [allegedly fraudulent] affidavit and *Page 899 
its draft without indication of Torok's previous payments to his former wife. Furthermore, Mrs. Torok's damages for alleged malpractice, if any, would stem directly from the primary suit and thus her suit closely approximates an action for indemnification."
The third-party complaint at issue in this appeal, though perhaps not, strictly speaking, a claim for indemnification, so "closely approximates an action for indemnification" that it should be judged by the rules with respect to "when a cause of action for indemnification occurs so as to trigger the running of the statutory limitations period," seeStonebrook Development, 854 So.2d at 591. See alsoEvans v. Union Bank of Switzerland, (No. Civ.A.01-1507, November 25, 2002), n. 15 (E.D.La. 2002) (not reported in F.Supp.2d) (noting that "[u]nder both Maryland and New York law, the limitations period for bringing a claim to recover damages caused by legal malpractice. . . . would not begin running [against a client who filed a third-party claim against his attorney] . . . until [the client] was actually forced to pay damages properly attributable to [his attorney]").
The act or omission of the lawyers giving rise to the Bank's legal-malpractice claim and triggering the limitations period could have occurred, under the reasoning in Panell
and the authorities cited herein, no earlier than May 11, 2001, when the trial court entered a judgment for Greene in the underlying action and Greene became entitled to sue the Bank for malicious prosecution. See Barrett v. Mobile HomeTransp., Inc. v. McGugin, supra. The Bank's third-party complaint filed on May 31, 2002, was, therefore, timely.
 The Bank's Third-Party Claim Against the Lawyers
The Alabama Supreme Court has recognized the following principles with regard to a legal-malpractice action:
 "`What a [client] must prove, basically, is no different from what must be proved in any other negligence suit. "To recover, the [client] must prove a duty, a breach of the duty, that the breach was the proximate cause of the injury, and damages." Herston v. Whitesell, 348 So.2d 1054, 1057 (Ala. 1977). (Citations omitted.) "A claim for malpractice requires a showing that in the absence of the alleged negligence the outcome of the case would have been different." Hall v. Thomas, 456 So.2d 67, 68 (Ala. 1984). (Citations omitted.)'
 "[Moseley v. Lewis Brackin, 533 So.2d 513] at 515 [ (Ala. 1988) ]. Moreover, with regard to the element of causation, `the [client] must show that, but for the defendant's negligence, he would have recovered on the underlying cause of action.' Johnson v. Home, 500 So.2d 1024, 1026 (Ala. 1986)."
Cribbs v. Shotts, 599 So.2d 17, 19 (Ala. 1992).See generally W. Atchison R. MacKenzie, TheProfessional Liability of Attorneys in Alabama, 30 Cumb. L.Rev. 453 (2000).
The main thrust of the lawyers' arguments in support of their motions for a summary judgment on the Bank's third-party claims was the well-known rule that there is no right to indemnity or contribution between joint tortfeasors in Alabama. See Crigler v. Salac, 438 So.2d 1375 (Ala. 1983); and Parker v. Maiddin, 353 So.2d 1375
(Ala. 1977).
Rule 14, Ala. R. Civ. P., allowing impleader, does not change the substantive law.
 "Rule 14 is entirely procedural in nature and will not affect substantive rights. It does not establish a right of reimbursement, indemnity nor contribution, *Page 900 
but merely provides a procedure for the enforcement of such rights where they are given by the substantive law. For example, negligent joint tortfeasors do not have a right of contribution against each other in Alabama. Gobble v. Bradford, 226 Ala. 517, 147 So. 619 (1933). Thus if a plaintiff sues one of two negligent joint tortfeasors, the one sued cannot implead the other under Rule 14, for he has no substantive right against the other. Brown v. Cranston, 132 F.2d 631 (2d Cir.1942), cert, denied, 319 U.S. 741 (1943), 63 S.Ct. 1028, 87 L.Ed. 1698; Lunderberg v. Bierman, 241 Minn. 349, 63 N.W.2d 355 (1954)."
Ala. R. Civ. P. 14, Committee Comments on 1973 Adoption.
By arguing the no-indemnity-between-joint-tortfeasors rule, the lawyers have, in essence, asserted an affirmative defense (contributory negligence) to the Bank's legal-malpractice (negligence) claim. In Ex parte General Motors Corp.,769 So.2d 903 (Ala. 1999), our supreme court explained that the burden of production on the party moving for a summary judgment depends on whether that party has the burden of proof at trial. Because, at trial, the lawyers would have the burden of establishing the defense of contributory negligence (that the Bank was not entitled to indemnity because it was a joint tortfeasor), see Whitaker v. Coca-Cola Co. USA,812 So.2d 1252 (Ala.Civ.App. 2001), the lawyers were required to support their motion with credible evidence, and the proof was required to be such that the lawyers would be entitled to a judgment as a matter of law ("JML") if the evidence was not controverted at trial. See Ex parte General Motors,769 So.2d at 909.
 The Commencement of the Lawsuit against Greene
In support of their motions for a summary judgment, the lawyers submitted all of their correspondence with the Bank leading up to the commencement of the debt-collection proceeding against Greene. They argued that, with respect to the commencement of the lawsuit against Greene, the Bank was negligent in leading them to believe that Greene was a proper party to be sued. Specifically, the lawyers asserted that the Bank was negligent by failing to tell them that Greene wasnot a guarantor of LCCI's credit-card indebtedness and that the signature on the guaranty agreement was not
that of Neal Greene, but that of Vincent LaCoste. They presented evidence that the Bank had, but did not send them, eight other guaranty agreements on the LCCI account, each bearing the same signature — that of a sole guarantor — a signature that, the lawyers say, is "squiggly" and difficult to decipher, if not illegible. The lawyers contended that, if they had received multiple guaranty agreements, each bearing the name of a different LCCI employee but the same signature of a sole guarantor, they would have understood that the signature on the one guaranty agreement they had was not Greene's and that Greene was not, therefore, a guarantor.
The Bank presented evidence indicating the following in opposition: (1) that the Bank employees never told the lawyers that Greene was a guarantor; (2) that the Bank employees sent the lawyers a guaranty agreement that designated Greene as a "borrower," not a "guarantor"; (3) that the Bank employees knew that LaCoste was a guarantor;[5] (4) that the Bank employees *Page 901 
knew the signature of the guarantor was LaCoste's and not Greene's; (5) that the lawyers did not inquire about the signature on the guaranty agreement; and (6) that in light of the facts in (1) through (5) above, the Bank employees had no reason to believe that they needed to tell the lawyers that Greene was not a guarantor or that the signature on the guaranty agreement was not Greene's.
The lawyers contend that the Bank was also negligent by signing and returning to them for commencement of suit a document entitled "Statement of Account/Sworn Statement of Claim" — a document that identified the Bank as "creditor," LCCI as "debtor," and that had Greene's name typed on the line below "LCCI." In opposition, the Bank presented evidence indicating that the lawyers did not tell the Bank's employees who reviewed and signed the "Statement of Account/Sworn Statement of Claim" (and the employees were otherwise unaware) that the import of the document listing LCCI as the "debtor" (singular), with Greene's name typed below LCCI, would be to make Greene a defendant in the collection suit.
We hold that, in opposition to the motions for summary judgment, the Bank presented substantial evidence that it was not negligent in its initial dealings with the lawyers leading up to the commencement of the lawsuit against Greene. Lawyers, by virtue of their legal training and experience, possess a greater ability than laymen to discern the legal significance of documents such as the ones at issue here: a guaranty agreement and a "Statement of Account/Sworn Statement of Claim." See Turner v. Kentucky Bar Ass'n,980 S.W.2d 560, 563 (Ky. 1998) (stating that "interpreting] legal documents" is one of several duties performed by paralegal assistants that must be accomplished "under the supervision and direction of a licensed lawyer"); Sisler v.Courier-News Co., 199 N.J.Super. 307, 319, 489 A.2d 704,710 (App.Div. 1985), rev'd on other grounds sub nom. Sislerv. Gannett Co., 104 N.J. 256, 516 A.2d 1083
(1986) (indicating that no reliance could be placed, as to the interpretation of a mortgage, on the opinion of a county clerk, "who [was] not a lawyer and whose duties [did] not include explaining the legal significance of documents").
"Perhaps the most fundamental legal skill [a lawyer brings to his representation of a client] consists of determining what kind of legal problems a situation may involve." Rule 1.1, Ala. R. Prof. Cond., Comment. "Competent handling of a particular matter includes inquiry into and factual analysis of the factual and legal elements of the problem."Id.
 "`It is obvious that the client must rely upon his lawyer to make a reasonable investigation of his case. Likewise, the attorney must accept the obligation to conduct a reasonable investigation in an attempt to find what the true facts are before filing a civil action on behalf of his client.'"
Hunt v. Dresie, 241 Kan. 647, 656, 740 P.2d 1046,1053 (1987) (quoting Nelson v. Miller, 227 Kan. 271,284, 607 P.2d 438, 448 (1980)). In Hunt v. Dresie, the Kansas Supreme Court reversed in part a trial court's summary judgment in a legal-malpractice action. The trial court had held that the attorneys lacked probable cause to file the actions that gave rise to a malicious-prosecution complaint against their client and that the attorneys were thereby negligent as a matter of law. The Kansas Supreme Court determined that *Page 902 
there were disputed issues of material fact that precluded a summary judgment on the claim that the attorneys were negligent. The court cautioned:
 "Whether or not [the attorneys] were negligent in filing the suits depends upon the totality of the circumstances as determined by the trier of facts. Because [trial] judges and appellate court judges are, themselves, attorneys, they naturally have opinions as to whether or not certain conduct constitutes legal malpractice. It is easy to slip into the trap of deciding such questions `as a matter of law.' Not having a like expertise in other professions such as medicine or architecture, the issues of professional negligence there are routinely submitted to juries. Nevertheless, claims of legal malpractice, like other forms of malpractice, are normally to be determined by the trier of fact rather than by summary judgment."
241 Kan. at 656, 740 P.2d at 1054. Heeding the admonition of the Kansas Supreme Court, we do not decide whether the lawyers or the Bank were negligent in commencing the suit against Greene. We hold only that the Bank, in opposition to the lawyers' motions for a summary judgment, presented substantial evidence that it was not negligent in commencing the suit.
 The Bank's Vicarious Liability for the Lawyers' Actions
Even assuming, however, that the conduct of the Bank's employees leading up to the commencement of the lawsuit against Greene was negligent, the lawyers were not entitled to a summary judgment on the Bank's third-party ALSLA claim for indemnity.
 "Alabama law analyzes problems involving two putative tort-feasors involved in an indemnification dispute arising out of a personal injury cause of action in terms of active versus passive negligence. The seminal case is Mallory S.S. Co. v. Druhan, 17 Ala.App. 365, 84 So. 874 (1920)."
Unicore, Inc. v. Tennessee Valley Auth.,768 F.2d 109, 112-113 (6th Cir.1985) (applying Alabama law). The active-versus-passive-negligence analysis used in MallorySteamship Co. v. Druham, 17 Ala.App. 365, 84 So. 874
(1920), is a well-established exception to the rule that joint tortfeasors may not claim indemnity against each other. The Alabama Supreme Court has indicated that the term "passive negligence" may be equivalent to "vicarious liability," "i.e., liability that the law imposes on one party for the wrongful conduct of another, as opposed to `active negligence,'" which "refer[s] to that form of liability based on one's own wrongful conduct." Nationwide Mut. Ins. Co. v. Hall,643 So.2d 551, 556 (Ala. 1994).
 "`The exceptions to the rule that indemnity will not be allowed among joint wrongdoers are that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the efficient cause of the injury. Where an injury results from a violation of a duty which one owes to another, the parties are not in pari delicto.
 "`. . . These exceptions to the general rule that no right of contribution or indemnity exists in favor of one joint tort-feasor against another are recognized in Alabama. . . .'
 "[Mallory S.S.,] 17 Ala.App. 365, 84 So. at 877-78.
 "The Mallory S.S. case has been frequently cited and never overruled."
Unicore, Inc. v. Tennessee Valley Auth.,768 F.2d at 112-113. See also Coates v. *Page 903 CTB, Inc., 173 F.Supp.2d 1200, 1203 (M.D.Ala.2001); andWalter L. Couse Co. v. Hardy Corp.,49 Ala.App. 552, 557, 274 So.2d 316, 320 (Civ.App. 1972), cert. denied,290 Ala. 134, 274 So.2d 322 (1973).
The lawyers cite Quality Homes Co. v. Sears, Roebuck Co., 496 So.2d 1 (Ala. 1986), and First RealEstate Corp. v. Winters, 551 So.2d 417
(Ala.Civ.App. 1989), for the proposition that if both parties — the Bank and the lawyers — were negligent in commencing the lawsuit against Greene but the conduct of the attorneys was the efficient or proximate cause of Greene's injuries, then the Bank could have asserted the lawyers' conduct as a defense to Greene's malicious-prosecution action, a break-in-the-chain-of-causation defense, that, the lawyers claim, would have relieved the Bank of liability for its own antecedent negligence and made its settlement with Greene and its indemnity claim against them unnecessary.[6]
Quality Homes and Winters are inapposite because, although each case may have involved an alleged joint tortfeasor who was arguably the proximate cause of an injury, neither case involved a principal-agent relationship, or mere "passive," "technical," or "constructive" fault, as those terms are used in Mallory Steamship. In other words, neither of the authorities on which the lawyers rely was a vicarious-liability case.
This appeal does present a question of vicarious liability: whether a client may be held vicariously liable to a third party for tortious conduct committed by the client's attorneys during litigation on the client's behalf and, if so, whether the client is entitled to indemnity from the attorneys. In vicarious-liability analysis, there are three types of relationships: master/servant; principal/agent; and independent contractor. See Restatement (Second) ofAgency § 2 (1958).
 "[A]n attorney is the duly authorized agent of his client and his acts are those of his client. The client is, therefore, bound by the acts of his attorney in the course of legal proceedings in the absence of fraud or collusion, and knowledge of the attorney is imputed to the client, notwithstanding the client had no actual knowledge or notice of the facts and circumstances."
Ex parte Aaron, 275 Ala. 377, 379, 155 So.2d 334,335 (1963) (Merrill, J., concurring specially) (citations omitted). See also Mitchum v. Hudgens, 533 So.2d 194
(Ala. 1988) (holding that an attorney is a special agent for his client during the prosecution or defense of his client's case). Section 8-2-7, Ala. Code 1975, a part of a chapter entitled "Agency," provides, in pertinent part:
 "[A] principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."
"It is elementary that omissions and commissions of an attorney at law are to be regarded as acts of the client whom he represents. Nelson v. Darling Shop of Birmingham,Inc., 275 Ala. 598, 157 So.2d 23 (1963); Cooper v.Cooper, 273 Ala. 694, 144 So.2d 62 (1962)." Lawrencev. Gayle, 294 Ala. 91, 94, 312 So.2d 385, 387 (1975).See generally Link v. Wabash R.R., *Page 904 370 U.S. 626, 633-34, 82 S.Ct. 1386, 8 L.Ed.2d 734
(1962) (stating that a client "cannot . . . avoid the consequences of the acts or omissions of [his] freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have `notice of all facts, notice of which can be charged upon the attorney'" (quoting Smith v. Ayer,101 U.S. (11 Otto) 320, 326, 25 L.Ed. 955 (1879))). Accord King v.Brown 103 R.I. 154, 156, 235 A.2d 874, 875 (1967) (stating that a "fundamental of agency law . . . imputes the neglect of an attorney in professional matters to his client and considers the omissions of the attorney as though they were the neglect of the client himself); and Wheiles v.Aetna Life Ins. Co., 68 F.2d 99 (5th Cir.1933) (holding that the negligence of an insurer's attorney was equivalent to the insurer's negligence).
Section 253 of the Restatement (Second) of Agency
addresses precisely the situation presented in this case. Entitled "Tortious Institution or Conduct of Legal Proceeding," that section states:
 "A principal who authorizes a servant or other agent to institute or conduct such legal proceedings as in his judgment are lawful and desirable for the protection of the principal's interests is subject to liability to a person against whom proceedings reasonably adapted to accomplish the principal's purposes are tortiously brought by the agent."
Restatement (Second) of Agency § 253 (1958). Comment a to § 253 explains:
 "The principal is liable only if the conduct of the agent is, in part at least, to carry out the purposes of the principal. The situation most frequently arising which involves the rule stated in this Section is that in which an attorney at law tortiously institutes or continues civil or criminal proceedings, or is guilty of oppressive or wrongful conduct during the course of the proceedings, in order that he may enforce a claim of the principal. The fact that the attorney is subject to discipline by the court does not prevent the client from being liable for his conduct."
See also 7A C.J.S. Attorney Client
§ 190 (1980) ("according to the ordinary rules of agency, a client may be bound by . . . the tortious institution, continuation, or prosecution of legal proceedings to enforce the client's claim" (footnote omitted)); Hewes v.Wolfe, 74 N.C.App. 610, 330 S.E.2d 16 (1985) (holding that when a client sued his business partner for an accounting of partnership assets and the client's attorney filed lis pendens notices on partnership property, the client was liable for attorney's wrongful acts in subsequent abuse-of-process action brought by partner against client and attorney); andCoffee v. Peterbilt of Nashville, Inc.,795 S.W.2d 656 (Tenn. 1990) (holding that a creditor who hired an attorney to collect on a bad check was liable to the debtor for false imprisonment after the attorney procured an arrest warrant from a court that did not have jurisdiction).
In Joyner v. AAA Cooper Transportation,477 So.2d 364 (Ala. 1985), the Alabama Supreme Court outlined three alternative ways of determining whether a principal is to be held liable for the intentional torts of its agents. The court stated:
 "For [the principal] to become liable for the[ ] alleged intentional torts of its agent, the [party claiming that the principal is liable] must offer evidence that the agent's wrongful acts were [1] in the line and scope of his employment . . .; or [2] that the acts were in furtherance of the business of [the principal] . . .; or [3] that [the principal] participated in, *Page 905 
authorized, or ratified the wrongful acts."
Joyner, 477 So.2d at 365 (emphasis added). Seealso Todd v. Modern Woodmen of America, 620 So.2d 591,593 (Ala. 1993). As the terms we have emphasized inJoyner indicate, the test of a principal's liability for the intentional torts of his agent is phrased in the disjunctive. Thus, a principal is liable — notwithstanding the agent's having acted outside the line and scope of his employment or the principal's not having authorized or ratified the agent's acts — if the agent's wrongful acts were "in furtherance of the business" of the principal. In support of that proposition, the Joyner
court cited Solmica of the Gulf Coast, Inc. v.Braggs, 285 Ala. 396, 232 So.2d 638 (1970).
In Solmica, an aluminum-siding installer, who furnished his own truck to haul materials for a seller of aluminum siding and who was permitted to pick up materials after office hours, was driving to the seller's place of business after office hours to pick up materials to finish a job. The installer stopped to have a few drinks with his brother-in-law, became intoxicated, and drove his truck into a pedestrian. The Alabama Supreme Court held that a jury question was presented as to whether the installer was acting in furtherance of the seller's business. The court stated:
 "The rule has many times been stated in our cases in varying language. Boiled down it is: To authorize the submission of the question to the jury, the evidence must have a tendency either directly or by reasonable inference to show that the wrong was committed by the agent while he was executing his agency, that is, undertaking to execute the duties assigned to him and not from a motive or purpose of his own having no relation to the business of the master. If the evidence tends to establish that the act was an incident to carrying out the duties assigned to him by his master, the master may be held liable though he did not authorize the agent to resort to such means in rendering the services for which he was employed and also though the agent may have sought to accomplish the master's business by improper or unlawful means or in a way unknown to his master or even contrary to his express directions."
Solmica, 285 Ala. at 401, 232 So.2d at 642
(emphasis added). See also Todd v. Modern Woodmen ofAmerica, supra (reversing a summary judgment for the insurer and holding that, when a soliciting agent tied a buyer's eligibility for the purchase of a fraudulent investment contract to the purchase of a policy from the insurer, the insurer could be liable to the purchaser because a jury could find that, although the agent's acts were not within the line and scope of his authority from the insurer, the acts were in furtherance of the business of the insurer).Compare Hendley v. Springhill Mem'l Hosp.,575 So.2d 547, 550 (Ala. 1990) (affirming a summary judgment for the hospital and holding that even if the vendor of a "TENS" pain-relief unit was an employee or agent of the hospital, the hospital was not liable when the vendor, posing as a gynecologist, performed a "vaginal examination" of a patient because "[a] tort committed by an agent, even if committed while engaged in the employment of the principal, is not attributable to the principal if it emanated from whollypersonal motives of the agent and was committed to gratifywholly personal objectives or desires of the agent" (emphasis added)).
The foregoing authorities demonstrate that a principal is liable for the intentional torts of its agent — even if the agent's acts were unknown to the principal, were outside the scope of the agent's *Page 906 
authority, and were contrary to the principal's express directions — if the agent's acts were in furtherance of the principal's business and not wholly for the gratification of the agent's personal objectives. Applying that rule to the present case, it is clear that all of the lawyers' actions in the litigation against Greene were attributable to the Bank — even if those actions were outside the scope of the lawyers' authority from the Bank and contrary to the Bank's express directions — because the record is devoid of any evidence that, when the lawyers sued, served, and recorded a judgment against Greene, their purpose was to accomplish some personal objective rather than to further the Bank's business objective of collecting a debt.
The lawyers contend that when the Bank instructed them to close the file on the LCCI debt-collection litigation, their authority from the Bank ended and anything they did after that cannot be attributed to the Bank under the principles of respondeat superior or the law of agency. We disagree. The evidence submitted on the motions for a summary judgment established without dispute that when the Bank instructed the lawyers to close the file, it was giving the lawyers express directions about how to conduct its business and the lawyers acted in a way that was contrary to those instructions. As the court in Solmica held, "the [principal] may be held liable though . . . the agent may have sought to accomplish the [principal's] business by improper or unlawful means or in a way unknown to his [principal] or even contrary to hisexpress directions." 285 Ala. at 401, 232 So.2d at 642
(emphasis added). The lawyers' contention is essentially an argument that they were acting outside the scope of their employment, an argument that may be factually correct but is not a legal basis for failing to attribute their actions to the Bank as long as they were acting in furtherance of the business of the Bank.
 The Continuation of the Lawsuit against Greene
The Bank alleged, and had the burden of proving, as an element of its legal-malpractice claim against the lawyers, that the lawyers breached their duties to it in three ways — by suing, serving, and recording a judgment against Greene. We have already discussed the Bank's first allegation and have held that the Bank presented substantial evidence that it was not contributorily negligent in commencing the lawsuit against Greene. We will now address the Bank's second and third allegations.
The second allegation relates to the service by publication on Greene. The Bank argues that the Stokes, Clinton firm negligently or recklessly caused Greene to be served by publication when a reasonable effort to determine Greene's home address would have resulted in personal service on Greene, thereby enabling Greene to appear, to argue for, and to obtain a dismissal of the Bank's lawsuit against him. In support of this allegation, the Bank submitted evidence indicating that the lawyers made only one attempt at personal service on Greene, at 3463 LaCoste Road in Mobile; that the sheriffs return on service was marked "not found — no longer employed by LCCI"; that a simple "skip-trace" search of the Mobile telephone directory would have revealed a "B. Neal Greene" residing at 6602 Cherry Point Court in Mobile; and that Paul Clinton's affidavit in support of the motion for service by publication was not based on personal knowledge or facts that would establish avoidance of service.
The lawyers submitted no evidence indicating that they had made an effort to find Greene or that they had personal knowledge that Greene was avoiding service. *Page 907 
Under the circumstances, the lawyers' motions were due to be denied. See Ex parte General Motors, 769 So.2d at 909
(stating that "`[i]f the burden of proof at trial is on the nonmovant [for a summary judgment] [here, the Bank], the movant [here, the lawyers] may satisfy the Rule 56 burden of production either by submitting affirmative evidence thatnegates an essential element in the nonmovant's claim or . . . by demonstrating to the trial court that the nonmovant's evidence is insufficient to establish an essential element of the nonmovant's claim'" (quoting Berner v.Caldwell, 543 So.2d 686, 691 (Ala. 1989) (Houston, J., concurring specially))). See generally Rule 4.3(c), Ala. R. Civ. P., Committee Comments on 1977 Complete Revision (stating that "more than mere inability to find the defendant is required" for service by publication because "avoidance of service" implies an "element of culpability on the part of the defendant"); and Vaughan v. O'Neal, 736 So.2d 635
(Ala.Civ.App. 1999) (holding that a conclusory statement in an affidavit that the defendant was "avoiding service," without reciting facts to support the conclusion, was insufficient to satisfy the requirements of Rule 4.3(d)(1), Ala. R. Civ. P.).
The Bank's third allegation is that after it instructed the Jones, Morrison firm to close the file on the LCCI collection matter, the lawyers breached their duty to the Bank by not immediately dismissing the lawsuit against LCCI and Greene. The Bank presented evidence that on May 10, 2000, 68 days after the debt-collection proceeding was filed in the Mobile Circuit Court and 4 months before Greene was served by publication, it instructed the Jones, Morrison firm to close the file on the case because Vincent D. LaCoste had filed for bankruptcy protection; that in September 2000 the Stokes, Clinton firm had Greene served by publication; that on October 18, 2000, the Jones, Morrison firm notified the Stokes, Clinton firm by mail of the close-file instruction from the Bank; that on October 30, 2000, the Mobile Circuit Court entered a default judgment against Greene; that the records of the Stokes, Clinton firm reflect that it received the close-file letter from the Jones, Morrison firm on November 22, 2000; that, one week later on November 29, 2000, the Stokes, Clinton firm recorded the judgment against Greene; and that when Greene discovered the judgment, he notified the Bank and the Bank had the judgment set aside immediately. The lawyers submitted no evidence to refute the evidence offered by the Bank.
We hold that, with respect to the lawyers' conduct in wrongfully continuing the lawsuit after May 10, 2000, there is no disputed issue of material fact. But for the lawyers' actions, Greene would not have been served by publication, could have appeared, and could have obtained a dismissal of the Bank's lawsuit against him. In addition, but for the lawyers' actions, Greene would not have had a judgment recorded against him on November 29, 2000. The lawyers' actions, as we have previously discussed, were attributable to the Bank. We now address the legal effect of those actions as they bear on Greene's claim against the Bank for malicious prosecution.
 Malicious Prosecution
The Bank had the burden of production with respect to whether the lawyers' actions amounted to malicious prosecution. See Ex parte General Motors, supra. The elements of a malicious-prosecution cause of action are:
 "(1) that the [Bank] instituted a prior judicial proceeding against [Greene]; (2) that in instituting the prior proceeding the [Bank] acted without probable cause and with malice; (3) that the prior proceeding *Page 908 
ended in favor of [Greene]; and (4) that [Greene] was damaged as a result of the prior proceeding."
Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166,174 (Ala. 2000).
The existence of the first, third, and fourth elements is undisputed. The existence of the first part of the second element — that the Bank sued Greene individually for LCCI's credit-card indebtedness without probable cause to believe he was personally liable for the debt — is also undisputed. "Where evidence of a lack of probable cause is presented and the facts are not in dispute, a question of law is presented, to be decided by the Court." Delchamps, Inc.v. Larry, 613 So.2d 1235, 1238 (Ala. 1992).
The dispute between the Bank and the lawyers centers on the second part of the second element of a malicious-prosecution claim: namely, malice. For that element, the Bank had the burden of submitting evidence that would have entitled Greene to a JML if the proof had not been controverted at trial, i.e., that the Bank, or agents acting on its behalf, commenced or continued a debt-collection proceeding against Greene with malice.
 "Malice is an inference of fact and may be inferred from the lack of probable cause or from mere wantonness or carelessness. Personal ill will or a desire for revenge is not essential to the existence of malice."
Delchamps, Inc. v. Larry, 613 So.2d at 1239
(citation omitted). We have already determined that there was no probable cause for the Bank's lawsuit against Greene. We have also decided that there is a disputed question of material fact as to whether the Bank — based on its own conduct or the conduct of its lawyers — was negligent incommencing that lawsuit. Even if that question of fact were resolved by finding the Bank negligent, an inference of malice could not be drawn from that finding of negligence alone because the good faith of the Bank or the lawyers might be a defense. See Delchamps, Inc. v. Bryant,738 So.2d 824 (Ala. 1999); Wal-Mart Stores, Inc. v. Goodman,supra. Nevertheless, "going forward carelessly or recklessly with previously commenced proceedings afterreceiving notice of a problem may be inconsistent with good faith." Delchamps, Inc. v. Bryant,738 So.2d at 834 (emphasis added).
In Delchamps, Inc. v. Bryant, Delchamps had a customer arrested as a result of the mistaken identity of a shoplifter. The store continued to proceed with the criminal charges against the customer despite "notice of [the customer's] potentially unassailable alibi." 738 So.2d at 827. After the criminal case was nol prossed, the customer sued the store, alleging malicious prosecution; a jury rendered a verdict in favor of the customer, and the trial court entered a judgment on that verdict. The store appealed to the Alabama Supreme Court from the denial of its post-judgment motion for a JML. Our supreme court held that the evidence was sufficient, when viewed in the light most favorable to the customer, for a jury to find the store liable for malicious prosecution.
In explaining that the evidence was sufficient for a jury to have found that Delchamps was merely negligent incommencing the prosecution, but that it was malicious in continuing the prosecution, the court relied on two early Alabama cases, Glidden Co. v. Laney,234 Ala. 475, 175 So. 296 (m7) ("Glidden I"), andLaney v. Glidden Co., 239 Ala. 396, 194 So. 849
(1940) ("Glidden II"). The court summarized those cases as follows:
 "Glidden I dealt with whether commencing a proceeding against a party sued by mistake was actionable, while *Page 909 Glidden II dealt with whether going forward with the proceeding against that party after learning of the mistake was actionable. In Glidden I, an attorney brought an action against the wrong party under circumstances where he had no basis to know that there were two people with similar names. His failure to appreciate that fact before commencing the action was found to be a `natural mistake' insufficient to support an action based on [malicious prosecution]. . . .
 "The same parties returned to this Court in Glidden II after the trial court sustained demurrers to a complaint charging malicious prosecution in the continuation of the action after the plaintiff learned of the mistake. In Glidden II, this Court reversed the ruling of the trial court, holding that the allegation that an action was negligently brought, but wrongfully, intentionally, maliciously, and without probable cause maintained after the plaintiff learned of the mistake, stated a claim for malicious prosecution. On the other hand, when a case of mistaken identity is discovered and the error is corrected by striking the improperly sued party, there is no inference of malice. Dillon v. Nix, 55 Ala.App. 611, 318 So.2d 308
(Ala.Civ.App. 1975)."
Delchamps, Inc. v. Bryant, 738 So.2d at 834.See Willis v. Parker, 814 So.2d 857, 864 (Ala. 2001) (citing Dillon v. Nix, 55 Ala.App. at 614,318 So.2d at 310, for the proposition that "[w]hen a party discovers his `mistake as to the proper party to be sued' and promptly corrects his error by discontinuing his suit against the wrong party, malice cannot be inferred from his actions for purposes of proving malicious prosecution"). See also Beecy v.Pucciarelli 387 Mass. 589, 441 N.E.2d 1035 (1982).
In Beecy v. Pucciarelli, the lawyer, Pucciarelli, went forward with a collection action against Mr. and Mrs. Beecy despite being informed by the Beecys that they owed nothing to the lawyer's department-store client and despite being told that he might have the Beecys confused with relatives of the same name — relatives who, it turned out, had a delinquent account with the department store. Following a telephone call by the Beecys to the department store's credit department, Pucciarelli dismissed the action and wrote a letter of apology to the Beecys, but he failed to instruct the sheriff not to serve them with the summons and complaint. The Beecys sued Pucciarelli, alleging, among other claims, malicious prosecution. The Supreme Judicial Court of Massachusetts affirmed the trial court's dismissal for failure to state a claim, holding that "[e]ven if it may be concluded that Mr. Pucciarelli acted without probable cause in filing the collection action, malice could not reasonably be inferred from his actions." 387 Mass. at 594, 441 N.E.2d at 1039. The court explained:
 "The Beecys argue that, if Mr. Pucciarelli commenced the collection action when he either knew that he was suing the wrong parties or should have known had he undertaken a reasonable investigation, malice may be inferred. Although there may be situations where such allegations would be sufficient to indicate an improper motive, the actual allegations in this case belie any malice on Mr. Pucciarelli's part. Cf. Adelman v. Rosenbaum, 133 Pa.Super. 386, 388-389, 3 A.2d 15 (1938) (malice was demonstrated where attorney continued to prosecute action after receiving notification that he was suing wrong party by way of two phone calls from wrongly-sued party, a communication from the sheriff sent to levy upon property, two calls from an attorney hired to represent wrongly-sued party, and an offer to compare signatures); Peerman v. Sidicane, *Page 910 605 S.W.2d 242, 245 (Tenn.App. 1980) (malice could be demonstrated where attorney continued to press [baseless medical-malpractice] case without consent or knowledge of client, made allegations in complaint predicated on pure speculation on attorney's part and not on knowledge given attorney by client, and prosecuted groundless appeal without consent of client)."
387 Mass. at 595, 441 N.E.2d at 1039.
As we have previously discussed, the Bank presented uncontradicted evidence indicating that, after Greene was wrongly named as a defendant in the lawsuit, the lawyers disregarded its instructions to close the file on the litigation, served Greene by publication, took a default judgment against him, and recorded that judgment. Based upon those facts and upon the foregoing authorities, we hold that the Bank produced sufficient evidence that, if not controverted at trial, would have entitled Green to a JML on his malicious-prosecution claim. Interestingly, over 60 years ago, the Alabama Supreme Court in Glidden I observed:
 "We have not had a case in which the court considered the question of whether the principal was liable for the act of his agent in prosecuting a civil suit without probable cause . . .; nor whether a client is held responsible in such a suit for the want of probable cause by his attorney."
234 Ala. at 479, 175 So. at 299. The Glidden I
court found it unnecessary to decide the issue in view of the fact that it held that the attorney's natural mistake was insufficient to support an action based on malicious prosecution. 234 Ala. at 479, 175 So. at 299. In GliddenII, the court implicitly resolved the issue when it reversed the trial court's ruling sustaining a demurrer to the amended complaint.
 Conclusion
In summary, we hold that the Bank presented substantial evidence indicating that it was not contributorily negligent in commencing the debt-collection action against Greene; however, even assuming that the Bank was negligent, the result would be the same. The Bank was vicariously liable for the acts of its lawyers when the lawyers pursued the litigation by having Greene served by publication, by taking a default judgment against him, and by recording the judgment. The facts are undisputed that those acts were undertaken in furtherance of the Bank's debt-collection business and were the efficient or proximate cause of Greene's injuries. We conclude that the Bank met its burden of production with respect to the "malice" element of Greene's malicious-prosecution claim. The judgment of the circuit court in favor of the lawyers on the Bank's third-party ALSLA claims is therefore reversed, and the cause is remanded for proceedings consistent with this opinion.
APPELLEES' MOTIONS TO DISMISS DENIED; REVERSED AND REMANDED.
THOMPSON and PITTMAN, JJ., concur.
MURDOCK and BRYAN, JJ., concur in the result, without writing. *Page 911 
Exhibit
[1] The record indicates that Stokes Clinton, P.C, is the successor of Stokes, Clinton, Fleming 
Sherling.
[2] The page on which LaCoste's signature appears is attached as an appendix to this opinion.
[3] In Amerisure II, the supreme court stated:
 "Even assuming that the circumstances and the relations of the parties could give rise to an implied contract of indemnification between Allstate and Amerisure after this Court's holding in the first appeal, no such implied contract could have existed at the time of the settlement and before this Court's reversal. At the time Amerisure informed Allstate of the proposed settlement, Allstate was not an indemnitor, but, rather, Allstate had a declaratory judgment from the trial court holding that it was not obligated to provide coverage."
603 So.2d at 964 (first emphasis added).
[4] For purposes of the discussion here, we will assume that the "occurrence" rule of Ex parte Panell
applies, although as we noted in Rutledge v. Freeman,914 So.2d 364 (Ala.Civ.App. 2004), Panell was a plurality opinion and the decisions purporting to apply it have been unclear.
[5] The Bank pointed out that an August 9, 1999, letter from the office manager at the Jones, Morrison firm to Sandra Nash of the Bank's recovery department, inquiring whether there was "a guarantee for all nine individual[s] that are signed on the individual accounts or just . . . apersonal guarantee on Vincent D. LaCoste?" demonstrates clearly that the Jones, Morrison firm knew that Vincent D. LaCoste was a guarantor.
[6] Rule 14(a), Ala. R. Civ. P., states that "[t]he third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim." The lawyers did not assert the defense they now argue was available to the Bank, or any other defense, against Greene. *Page 912