232 So.2d 638

**SOLMICA OF The GULF COAST, INC.**

v.

**Louise BRAGGS, as Administratrix Of The Estate of Elaine Loretta Braggs, Deceased.**

**I Div. 549.**

Supreme Court of Alabama.

Feb. 5, 1970.

Rehearing Denied March 19, 1970.

Inge, Twitty, Duffy & Prince, Mobile, for appellant.

Cunningham, Bounds & Byrd, Mobile, for appellee.

MADDOX, Justice.

The sole issue in this case is whether or not at the time John Edward Cornelson ran over and killed Elaine Loretta Braggs, he was an agent, servant, or employee, acting within the line and scope of his author-ity as such in furtherance of the business of Solmica of the Gulf Coast.

There is agreement on the statement of the case. There is obvious disagreement over the refusal of the trial court to give the affirmative charge in favor of the appellant. The appellant assigns the refusal to give the affirmative charge as error.

The suit was brought by Louise Braggs, as Administratrix of the estate of Elaine Loretta Braggs, claiming $135,000 damages for the death of her intestate, caused by John Edward Cornelson in the operation of his pickup truck.

The case was tried and submitted to a jury which returned a verdict for the plaintiff and against the defendants in the amount of $30,000. A motion for a new trial was overruled.

To recover against a defendant upon the theory of *respondeat superior,* it is necessary for the plaintiff to establish the status of master and servant and that the act done was within the scope of the servant's employment. United States Steel Co. v. Butler, 260 Ala. 190, 69 So.2d 685.

It is the reserved right of control rather than its actual exercise that furnishes the true test of whether the relation between the parties is that of an independent contractor or of employer and employee—master and servant. Moore-Hanley Hardware Co. v. Williams, 238 Ala. 189, 189 So. 757.

For one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, not only what shall be done, but how it shall be done. Weeks v. C. L. Dickert Lumber Co., 270 Ala. 713, 121 So. 2d 894 and cases there cited.

Because this is a close case we set out considerable evidence. The evidence showed that Solmica made contracts with individual homeowners for the application

of aluminum siding on their houses. Cornelson was an applicator and was paid $15.-00 per square for the application of the siding and $1.00 per square for transportation expense up to 50 miles, and $2.00 per square for mileage up to 100 miles. Cornelson furnished his own truck to haul the material to the job site. He secured such additional help as he needed to apply the siding and when he got a job he would estimate how long he thought it would take to complete it; then he would select the men to do the job with him and he would make an arrangement with these helpers as to the amount they would be paid. Solmica was aware of the fact that applicators got others to assist them, but the $15.00 per square rate was the same, regardless of what arrangement an applicator might otherwise make. No social security or withholding was deducted by Solmica, but Solmica did deduct 4% of the gross sum paid to applicators for "insurance." What kind of insurance was never shown.

The accident happened around 6:30 or 6:40 P.M. on July 1, 1965. On the morning of July 1, Cornelson and the men working for him—a Mr. Howell, a Mr. Coffee and his brother, Kenneth Cornelson, went to the Solmica office in Coffee's automobile shortly before 8:00 A.M. They left Solmica's office at about 9:30 A.M. after getting the job assignment in Pascagoula, Mississippi, from a Solmica employee. They went to Pascagoula and left the job site at approximately 3:30 P.M. and started back to Mobile. On the way back they stopped while Cornelson's brother-in-law bought a "couple of beers" and Cornelson had a "sip" of beer himself. They arrived at Cornelson's house in Mobile at about 4:30 or 5:00 P.M., and Coffee and Howell separated from Cornelson there. Cornelson changed clothes and took his brother Kenneth to their mother's house in his pickup truck. From 4:30 to 5:45 P.M. he had four drinks. He was drinking bourbon straight out of the bottle. He left his mother's house at about 5:45 P.M.

Cornelson testified that normal working hours for Solmica were 8:00 A.M. to 4:00 P.M., but that it was customary to be able to pick up materials after working hours if such materials were needed for a particular job.

When Cornelson left his mother's house he stopped for gas and the accident occurred shortly thereafter on Stone Street in Mobile. Police officers investigating the accident testified that Cornelson passed out in the police car after his arrest and that a pint bottle of whiskey found in the pickup truck was about half full. One of the investigating officers testified that "later in the afternoon" and while interrogating Cornelson about the events leading up to the accident, in answer to a question relative to where he was going, "He said that he didn't know—that he was probably going to his office." We set out some of the evidence with regard to the Solmica-Cornelson arrangement in a footnote below.[1]

1. Cornelson testified relative to the arrangement:
"* * * They [Solmica] didn't have to let us do it [pick up the material late] but we done it. All the applicators done such as this."
Cornelson also testified as follows:
"Q. When you were on the job at Pascagoula, you and those other men who you have named, did you sort of supervise them and tell them what to do and how to do it and all that?
A. Yes, sir, I was responsible for the job, if that's what you want.
Q. As to how the work was to be performed?

A. Yes, sir.
Q. Did you agree with those men whom you would take along with you as to when you would report for work and how long you would have for lunch and when you would come back, or knock off in the afternoon?
A. No, sir, we never had no set time at any time, not any time that I ever work with them.
Q. How would you know what time for them * * *
A. Well, we had it set up in this particular instance that we would leave out in the mornings, if it was a long ways to go, we tried to leave as early

**400**

We now come to some of the tendencies of the evidence favorable to the plaintiff. Solmica told Cornelson what supplies to take to a job, instructed that any supplies that were left over after a job were to be returned to it, would send him back to remedy a job when a customer was not satisfied, would not pay him until the customer was satisfied, solicited the jobs he worked on and assigned him to the job, could pull him off a job at any time it wanted to, furnished all the necessary material for the job, allowed him to charge additional materials needed to its account, withheld four percent of his gross wages for insurance, occasionally had him perform in their office or warehouse and had him deliver materials to his own job and other jobs on which others were working.

The manager of Solmica testified that he instructed Cornelson and the other applicators as to the way he wanted the siding applied and from time to time he checked their jobs and, if the work was not done correctly, he either instructed them to change the type of work they were doing or dismiss the applicator or fired him from the job, and that he had required them to redo work.

In view of our scintilla rule, there was sufficient evidence from which the jury could find that the relationship between Solmica and Cornelson was that of master and servant.

Appellant states in brief:

"* * * It really makes no difference for argument purposes whether John Edward Cornelson was an employee of Solmica of the Gulf Coast or whether he was simply an independent contractor. * * * The issue in this case is whether or not, at the time John Edward Cornelson ran over and killed Elaine Loretta Braggs, he was an agent, servant or employee, acting within the line and scope of his authority as such, in furtherance of the business of Solmica of the Gulf Coast."

Having determined that he was the agent of appellant, the question to be decided is

as we could, provided we had the stuff to work with; if we didn't have the stuff to work with we was always ten or eleven o'clock getting on the road.
Q. You say you would always have your understanding, you mean you would have that understanding with Dave and Tom and Kenneth as to what time you were going to leave to go down there?
A. When we didn't have the material —this is relevant to this case—when we didn't have the material, we always went to the office, or if we didn't have another job, let's put it that way, we always went to the office to find out what work we would have for that particular day and we was generally told by 9:00 or say 10:00 o'clock whether there was going to be work or not, that's the job, I mean a job to take out.
Q. When you left—you men gathered together either at your house or at one of your friend's house to either go to a job or go to the office, you would have an understanding with each other as to what time to meet, didn't you?
A. As a general rule it was around quarter to seven or seven o'clock, if the job wasn't too far, and especially if one was here in town, see we worked

in town as well as out and if we were going way out, like my brother, I'd call him and tell him to be ready at five o'clock or four thirty, whatever time we figured it would take. See, the jobs were not pushed for time, if you understand that.
Q. That's what I was getting at, you would call your brother and tell him what time to meet * * *
A. All right. I want you to be ready at five o'clock. I could do that any way I wanted to do it.
Q. And the same thing happened when you got ready to knock off in the afternoon?
A. I could knock off at twelve if I wanted to, I could knock off any time I got ready to.
Q. You were the boss on the job?
A. I was supposed to be the boss."
Relative to the practice of picking up the material after working hours, Cornelson also testified:
"A. It wasn't anything that would inconvenience the company. There would be girls working at night. It wasn't any inconvenience to anybody. There was someone there so we could sign the ticket for the material we got out."

whether Cornelson was acting within the line and scope of his authority in furtherance of the business of Solmica when the accident occurred.

The rule has many times been stated in our cases in varying language. Boiled down it is: To authorize the submission of the question to the jury, the evidence must have a tendency either directly or by reasonable inference to show that the wrong was committed by the agent while he was executing his agency, that is, undertaking to execute the duties assigned to him and not from a motive or purpose of his own having no relation to the business of the master. If the evidence tends to establish that the act was an incident to carrying out the duties assigned to him by his master, the master may be held liable though he did not authorize the agent to resort to such means in rendering the services for which he was employed and also though the agent may have sought to accomplish the master's business by improper or unlawful means or in a way unknown to his master or even contrary to his express directions. The legal aspect of such a case is not changed because the agent superadds malice or other improper motive to his otherwise wrongful act. United States Steel Co. v. Butler, 260 Ala. 190, 69 So.2d 685, and cases there cited.

In Nelson v. Johnson, 264 Ala. 422, 88 So.2d 358, the employee, Nelson, had the job of servicing signal flares at excavations in the streets. On Sunday morning, he blew out the flares, refilled the containers with fuel and went to the city garage. Sometime after noon, he started home where he would wait until late afternoon when he would again relight the flares. On his way home, the truck he was driving collided with the motorcycle plaintiff was riding. This court said:

" * * * The test is the service in which the employee is engaged. City of Bessemer v. Barnett [212 Ala. 202, 102 So. 23]. The rule which has been approved for determining whether certain conduct of an employee is within the line and scope of his employment is substantially that if an employee is engaged to perform a certain service, whatever he does to that end, or in furtherance of the employment, is deemed by law to be an act done within the scope of the employment. Railway Express Agency v. Burns, 225 Ala. 557, 52 So.2d 177; Rochester-Hall Drug Co. v. Bowden, 218 Ala. 242, 118 So. 674. Here, Nelson had the duty to service the flares and whatever he did to that end was within the scope of his employment. The issue was properly left to the determination of the jury."

The conduct of the employee, to come within the rule, must not be impelled by motives that are wholly personal, or to gratify his own feelings or resentment, but should be in promotion of the business of his employment. Rochester-Hall Drug Co. v. Bowden, supra.

In the instant case, Solmica was in the business of selling and installing its materials. The materials were taken to the job by the applicators. Cornelson's truck was specially equipped to haul the materials and Solmica paid him to haul them. The evidence was that all the materials were not available that morning when Cornelson left for Pascagoula at 9:30 A.M. Cornelson testified that had they been available, he would not have had to carry more the following day. Solmica kept its lot open after regular business hours so that materials for use the next day could be picked up. This was a regular custom and "all the applicators done such as this." The materials were usually picked up in the afternoon or night because the applicators usually left Mobile before opening hours when they were working on a job out of the city.

Cornelson testified by deposition and also at the trial. In both the deposition and at the trial, he stated that he was going to Solmica's office to pick up the additional materials needed to finish the job. These materials, including corners, had not been available that morning. His procuring the

**402**

materials were not incidental to his job but were a benefit to Solmica because the job could not be performed without the materials.

█ In Atlanta Life Ins. Co. v. Stanley, 276 Ala. 642, 165 So.2d 731, this court said:

"* * * However, where a master bears a part of the expense of an automobile used by his servant in going to and from his work and in and about his employment, and such transportation arrangement is beneficial to both, the relation of master and servant continues while the automobile is used for such purposes. * * *"

And we have held in other cases that under some circumstances ownership is of no consequence in determining the issue of agency. Glass v. Davison, 276 Ala. 328, 161 So.2d 811, and Luquire Ins. Co. v. McCalla, 244 Ala. 479, 13 So.2d 865.

█ Since one of Cornelson's duties was to take Solmica's material to the job he was working on and Solmica permitted him to pick the materials up after regular office hours, and it was in the furtherance of his employment and a benefit both to him and to Solmica to get the materials on the job, we think a jury question was presented as to whether he was acting within the line and scope of his employment when he was on his way to pick up the materials. No question is raised as to Cornelson's negligence. The proof is ample that he was negligent.

As we said before, this is a close case, but it appears that a jury question was presented and the trial court did not commit error in submitting the question of agency to the jury, and the judgment of the trial court is due to be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON, MERRILL and HARWOOD, JJ., concur.