MOORE, Judge.
Dolores Owen (“Owen”), individually and as personal representative of the estate of Patricia Owen, deceased, appeals from a summary judgment entered by the Morgan Circuit Court (“the trial court”) in favor of Tennessee Valley Printing Company, Inc., d/b/a The Decatur Daily (“TVPC”). We affirm.

Procedural History

Owen’s complaint was originally filed on September 8, 2011; as finally amended, the complaint alleged, in pertinent part, that, on August 31, 2011, Felton Leon Johnson (“Leon”), while acting as an agent for TVPC delivering newspapers to a Kroger grocery store, struck Patricia Owen (“Patricia”) with his vehicle in the Kroger parking lot, causing her injuries that ultimately led to her death. The complaint, as finally amended, asserted claims against Leon, TVPC, Decatur Ventures, LTD, and several fictitiously named defendants.
On January 30, 2012, TVPC filed a motion for a summary judgment, along with a brief and evidentiary submissions in support thereof, asserting that Leon’s wife, Carolyn Johnson (“Johnson”), was an independent contractor for TVPC, not an employee of TVPC, and that Leon had been delivering newspapers as a favor to Johnson at the time he struck Patricia. Therefore, TVPC argued, it had no liability in this ease. On February 25, 2013, Owen filed a response in opposition to TVPC’s summary-judgment motion, along with evi-dentiary submissions in support thereof, arguing that Johnson was an employee of TVPC and that Leon had been acting as a subagent of Johnson. On March 4, 2013, TVPC filed a reply to Owen’s response.
On April 15, 2013, the trial court entered a summary judgment in TVPC’s favor, dismissing all claims asserted against TVPC and certifying the judgment as final, pursuant to Rule 54(b), Ala. R. Civ. P. On May 15, 2013, Owen filed a postjudgment motion; that motion was denied on June 5, 2013. On July 15, 2013, Owen filed her notice of appeal to the Alabama Supreme Court; that court transferred the appeal to this court; pursuant to § 12-2-7(6), Ala. Code 1975. This court heard oral argument on this appeal on March 19, 2014.

Facts

Mike McKillip, the circulation director for TVPC, stated in his affidavit that TVPC utilizes independent contractors to deliver newspapers for The Decatur Daily and that TVPC “has two different types of routes available for independent contractors, single copy routes[ ] and home delivery routes.” He stated that a single-copy route consists of filling newspaper racks and delivering newspapers to newsstands at commercial locations and that a home-delivery route consists of delivering newspapers to residential homes. McKillip stated that, at the time of the accident, Johnson had contracts with TVPC for both a single-copy route and a home-delivery route. It is undisputed that Leon was delivering newspapers on Johnson’s single-copy route at the time the accident occurred.
Johnson testified in her deposition that she had first entered into a contract with TVPC in 1990 and that she had continuously delivered newspapers for TVPC from 1990 through the time of the accident. Johnson testified that she had moved to Florida for eight months in 2008 *1223 but that she had made arrangements with a substitute driver to fulfill her contract while she was away.
Johnson’s contract with TVPC for the-single-copy route (“the single-copy-route contract”) provided, in pertinent part:
“[Johnson] agrees that he/she operates an independently established business of delivering and/or distribution of delivering and/or distribution of newspapers, and intends to create an independent contractor relationship with [TVPC] under this Agreement. [Johnson] has the sole right to control the manner and means of performing under this agreement, including the right to determine, use and bear the expense of vehicles, machinery, equipment and supplies. [Johnson] has the right to retain individuals of his/her own choosing and contract with others to fulfill this Agreement. [Johnson] shall be solely responsible for contracting, compensating, controlling and discharging persons used by him/her to help provide distribution services under this Agreement and providing Worker[s’] Compensation Insurance and Unemployment Insurance to the extent required by law, for all such persons. However, if [Johnson] is unable to deliver his/her route and does not provide an adequate substitute, a daily fee in the amount of $50.00 for City routes or a fee of $75.00 for State routes will be assessed to [Johnson’s] account.”
McKillip stated in his affidavit that a prospective independent contractor must submit an application and confirm that he or she owns a vehicle, has a valid Alabama driver’s license, and has the minimum automobile insurance required by Alabama law. A copy of the application that was submitted by Johnson was introduced into evidence. The application required her to list the make and model of her vehicles and to designate a substitute driver. Johnson designated Leon as her substitute driver. McKillip testified that if Johnson had not furnished a substitute driver in the event she was unable to complete her route herself, a TVPC district manager would have delivered the papers on that route. Johnson testified that she often had hired substitute' drivers who were not family members but that she sometimes had asked Leon and her son to help. She testified that it had been her responsibility to deliver the newspapers no matter what she had to do to complete the deliveries. Both McKillip and Johnson testified that Johnson had not been required to inform TVPC who she used as substitute drivers.
Johnson’s single-copy-route contract provided that Johnson would “deliver-newspapers, inserts and/or other material (if any) as a complete and assembled package to each subscriber in a safe and dry condition, in a timely manner and to the satisfaction of subscribers.” It further stated: “The parties recognize that a newspaper is a highly perishable product, and in the newspaper industry, delivery by 6:00 am daily is widely regarded as satisfactory to the subscriber.” The single-copy-route contract further provided:
“[Johnson] agrees not to stamp on, insert into or attach to copies of the newspaper any advertising of other material which is not furnished to [Johnson] by [TVPC], except with prior written approval of [TVPC]; nor shall [Johnson] insert copies of newspapers within any imprinted wrapping, covering or container that has not been furnished or sold to [Johnson] by [TVPC].”
Additionally, the single-copy-route contract provided that Johnson would be penalized $1.00 for each customer complaint “under 10 complaints” and $2.00 per customer complaint for each customer complaint “over 10 complaints.” Johnson tes- *1224 tifíed that TVPC had not followed up to confirm if she had made her deliveries and that the only way TVPC would have known that she had missed a delivery was if a customer filed a complaint. She testified that, if she had failed to make a delivery, a TVPC employee would have made the delivery and she would have been charged $5.00 for each newspaper delivered by that employee. McKillip stated in his affidavit, and Johnson confirmed in her deposition, that no penalty was imposed for the late delivery of the newspapers on the single-copy route. Johnson testified that her incentive for delivering the newspapers early on the single-copy route had been to sell more papers and, thus, increase the amount of money she made.
McKillip testified in his deposition that the newspapers are scheduled to arrive at the loading dock of The Decatur Daily office daily between 1:30 and 2:30 a.m. and that the independent contractors can arrive whenever they choose. Johnson testified that she would arrive at the loading dock of The Decatur Daily office between 1:00 a.m. and 1:30 a.m. to meet the truck that delivered the newspapers. She testified that Laura Behand, a district manager for TVPC, would send her a text message if the newspapers were going to be delivered late. She testified that she had to bag the newspapers for delivery on the home-delivery route and that, on Sundays, she had to bind the newspapers for the racks on the single-copy route. Leon testified that, if the truck delivering the newspapers to the loading dock had not arrived by the time he arrived at the location, he waited in the parking lot or on the loading dock.
McKillip testified in his deposition that, for the single-copy route, the newspapers are sold to the independent contractors at a wholesale price as set out in each independent contractor’s contract. He testified that each independent contractor’s wholesale price is different but that Johnson’s wholesale price was $.40 for a daily newspaper and $1.00 for a Sunday newspaper. McKillip testified that TVPC suggests that the retail price for the newspapers be $.50 for a daily newspaper and $1.25 for a Sunday newspaper and that those prices are the prices that the independent contractors generally charge for the newspapers. He testified that the retail price is stamped on the racks but that the independent contractors are free to set their own price for the newspapers and may change the price on the racks. Johnson, however, testified that she had had no say in setting the sales price for the newspapers.
McKillip stated in his affidavit that Johnson’s profit from her routes had been the difference in the price that she had sold the newspapers for and the price that she had paid for them and that she had born all the expenses entailed in her business, including the transportation expenses. McKillip testified that Johnson had rented the newspaper racks from TVPC for $.50 per week. Johnson testified that she also had had to purchase the bags used for the newspapers on the home-delivery route. McKillip testified in his deposition that TVPC had recently instituted a gas-allowance program that provides an allowance if gas prices rise over $3.50 per gallon. Johnson testified that the gasoline allowance had been the only way in which TVPC had assisted her in defraying her transportation expenses. McKillip stated that Johnson had been required to pay for the newspapers she purchased regardless of whether she had difficulty collecting from her customers on the home-delivery route but that TVPC had reimbursed her for any newspapers that did not sell in the racks. McKillip testified in his deposition that Johnson had born the risk of theft from the racks. *1225 Johnson testified that she had not had to account for the amount of her profits to TVPC.
McKillip stated in his affidavit that the independent contractors are allowed to accept checks made payable to TVPC but that they may not negotiate or endorse those checks. He stated that the checks made payable to TVPC must be turned in* to TVPC and that those checks are then credited to the independent contractor’s account. Johnson testified that two or three of her customers had paid her directly but that most of her customers had paid TVPC directly. She testified that she had spoken to some of her home-delivery customers and that they had known her as the person who delivered their newspapers.
McKillip stated in his affidavit, and Johnson also testified in her deposition, that TVPC does not purchase any insurance coverage for the independent contractors and that it does not take any deductions from payments it makes to the independent contractors to pay premiums for any insurance coverage. McKillip stated that TVPC does not take any deductions for Social Security or federal or state taxes from any payments it makes to the independent contractors; that the independent contractors are not on TVPC’s payroll as employees; and that, when required, TVPC issues 1099 tax forms rather than W-2 forms. A copy of the “W-9 Request for Taxpayer Identification Number and Certification” form that was submitted by Johnson to the Internal Revenue Service was introduced into evidence.
McKillip stated in his affidavit that TVPC does not have any incentive or bonus programs for the independent contractors who deliver newspapers and that it does not offer any benefits to them. Johnson testified, however, that she had heard of bonuses being awarded to independent contractors; that, when she had been delivering newspapers, TVPC had sponsored promotions at certain times; and that she had earned extra money once during a promotion.
McKillip stated in his affidavit that TVPC had not “controlled], or reserve[d] the right to control the manner in which Mrs. Johnson performed her duties under either [of her contracts].” McKillip stated that TVPC does not provide a training manual, a safety manual, or any other type of written policies, procedures, or guidelines for the independent contractors. He stated that the only document that governs the relationship between TVPC and an independent contractor is the contract itself. He stated that TVPC does not provide training to the independent contractors other than showing the independent contractor his or her route by having him or her ride with an independent contractor who would show him or her the route, by showing the independent contractor the addresses on the route on a map, by providing the independent contractor a customer list, or by having the independent contractor listen to an audiocassette tape made by a former independent contractor stating where each house is located on the route. He testified that the independent contractors are not required to make an audiocassette tape recording. He stated that new independent contractors who are given a single-copy route are provided with a list of outlets along that route and that the independent contractor rides with another independent contractor or a TVPC employee who identifies the racks. McKil-lip also stated that TVPC does not require the independent contractors to follow a certain route or to stop and go at certain points and that it does not control the manner or method of the independent contractors’ routes. He also stated that TVPC does not direct the independent *1226 contractors as to how many newspapers to put in each rack. McKillip testified that, although there are no training requirements, the independent contractors are provided with opportunities to learn the best way to do their jobs.
Johnson testified that she did not go through any training process but that a TVPC employee had taken her around the route on two or three days. She testified that the district manager had instructed her how to deliver the newspapers on the home-delivery route and that TVPC employees had told the previous independent contractor who had had the single-copy route that Johnson was taking over to show her the route. Johnson testified that she did not receive a manual or a handbook but that she had received customer lists. She testified that TVPC had not required her to enter a parking lot from a certain direction, and, she testified, she had usually entered the Kroger parking lot from a different direction than had Leon. She testified that, on Sundays, she had left some of the newspapers at her house and would return back to the house at various times to restock her vehicle because she could not fit all the Sunday newspapers in her vehicle.
Leon testified that he had had no training other than Johnson telling him the route he had to follow. He testified that he did not know of any rules other than the delivery deadline. Owen introduced into evidence a “Training Check List” for the single-copy route that was signed by Johnson and dated May 17, 2007, which had check marks by the following phrases: “Due date to be Thurs. of each week,” “Single copy bill,” “Return sheet,” “Calling in returns,” and “28 day notice.” No testimony was presented indicating what those phrases represented.[1]
The evidence was undisputed that TVPC does not provide signage to the independent contractors for use on their vehicles and that it does not provide the independent contractors with business cards. Johnson testified that she had not been •required to wear clothing with any type of logo on it. She also testified that TVPC had given the independent contractors gloves for Christmas one year that had “Decatur Daily” written on them and that she had sometimes used those gloves when making her deliveries. She testified that, at times, she had used a light on her vehicle when she was making deliveries but that it had not been required by TVPC.
McKillip stated in his affidavit that Johnson had had the discretion to move the racks wherever she chose and that she had been free to arrange to place a rack at another business. The single-copy-route contract required Johnson to use her “best efforts to maintain and increase the number of paid subscribers within [her area of primary responsibility].” McKillip testified in his deposition that, if an independent contractor acquired a new subscriber that was outside that contractor’s territory, the independent contractor would have the option of keeping the subscriber or transferring it to the independent contractor who had the territory in which the new subscriber was located.
McKillip testified that the district managers are usually at The Decatur Daily’s office to ensure that all the newspapers are picked up for delivery by the independent contractors. He testified that TVPC’s district managers monitor the performance of the independent contractors to *1227 determine whether the performance standards of their contracts are being met but that they do not supervise the independent contractors or have the right to reprimand the independent contractors.
Johnson testified that Laura Behand was her supervisor for the home-delivery route. Johnson testified that she guessed Behand would be considered the boss but that she was really a “go between” between the independent contractors and The Decatur Daily and that she had answered to Behand. She testified that Be-hand had had the right to tell her how to do her job and to change her route and that she had had to follow the directions of Behand. Johnson testified that one district manager had told her to use her flashers on her vehicle when she was delivering the newspapers but that it had usually been left to her discretion whether to use them. She also testified that the management that was in charge at TVPC toward the end of her time delivering newspapers would “get kind of rough with you if you missed your deadline.” She testified that if an independent contractor missed a deadline often, the route was reassigned to another independent contractor.
Johnson testified that information from TVPC, such as complaints or stop-delivery requests, was given out to the independent contractors on “lead sheets” at the first of every month. Johnson testified that she had telephoned Behand after Leon’s accident and that Behand had telephoned a person who drives as a substitute for TVPC and had asked her to cover Johnson’s home-delivery route.
Leon testified that he had seen Behand on some occasions when he had picked up newspapers but that she had not given him any instructions. In his deposition, Leon referred to Behand as having been Johnson’s boss and her supervisor, but he later testified that he did not know the details of Johnson’s relationship with Behand and that Johnson had not worked for The Decatur Daily but, instead, had worked for herself.
The job description for TVPC’s district-manager positions was introduced into evidence; it stated that the job purpose was to “administer independent contractor relationship and problems that assure circulation growth, good customer service and accurate subscriber information.” The “essential job. responsibilities” included “advis[ing] independent contractors on effective business practices that best serve subscriber; managing a] group of 12-25 independent contractors; assuring] all carriers are contracted, administered and termed according to the contents of the independent contractor agreement; [and] holdfing] all contract carriers to the levels of responsibility conducive with the terms of the independent contractor agreement.”
The single-copy-route contract provided that Johnson “may engage in any other business, including the delivery of other newspapers provided such activities do not interfere with [her] duties and obligations [set forth in the single-copy-route contract].” Johnson testified that, although she could have delivered for other newspaper companies, she had not done so. Johnson agreed that TVPC did “not treat [a] Contractor as an employee for Federal tax purposes with respect to the services [she had performed and that she would have] instead occupied] the status of a direct seller pursuant to 26 U.S.C. 3508.” She also agreed that she had not received any of the benefits that TVPC provided to its employees.
The single-copy-route contract further provided:
“[Johnson] is not an agent or employee of [TVPC]. [Johnson] may not employ or contract with any person on behalf of [TVPC]. [Johnson], under the Agree- *1228 raent, does not have the right to use any [TVPC] trademarks, trade names, service marks, slogans or logos in which [TVPC] has any right or interest. [Johnson] may not use this Agreement and/or [Johnson’s] independent relationship with [TVPC] to establish any account with any bank or other institution.
[[Image here]]
“[TVPC] shall have no liability for any loss, damage, or expenses incurred or caused by [Johnson] in the performance of this Agreement. [Johnson] agrees to hold [TVPC] harmless from and indemnify [TVPC] for any damage or injury, including any attorney’s fees and costs associated therewith, to the person or property of:
“(a) [Johnson]
“(b) [Johnson’s] agents, employees or contractors
“(c) anyone injured or any property damaged through the acts or omissions of [Johnson] or [Johnson’s] agents, employees or contractors.”
McKillip testified in his deposition that the independent contractors are not required to submit to drug tests but that employees of TVPC are required to do so. He testified that TVPC does not track accidents in which the independent contractors are involved and that, unlike with employees, there is no procedure that the independent contractors must follow when an accident occurs.
The single-eopy-route contract provided that it could be terminated by either party with 28 days’ notice but that it could also be terminated by TVPC immediately for any reason. McKillip testified in his deposition that TVPC can reduce an independent contractor’s route only upon the independent contractor’s failure to perform,

Standard of Review

“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).

Discussion

On appeal, Owen argues that the trial court erred in entering a summary judgment in TVPC’s favor because, she says, there is a genuine issue of material fact regarding whether Johnson was an independent contractor or an employee of TVPC. Both parties have discussed in their briefs three Alabama cases in which *1229 the issue was whether a newspaper-delivery person was an independent contractor or an employee in the context of a summary-judgment motion. We will discuss each of those cases in the order in which they were released.
In Brown v. Commercial Dispatch Publishing Co., 504 So.2d 245 (Ala.1987), the Lamar Circuit Court entered a summary judgment in favor of Commercial Dispatch Publishing Company, Inc. (“Commercial Dispatch”), determining, as a matter of law, that Christian Ott, a newspaper-delivery person, was an independent contractor of Commercial Dispatch. On appeal, our supreme court set forth the law governing whether a person is an independent contractor or an employee, agent, or servant:
“Whether one is the agent of another is ordinarily a question of fact to be decided by the jury. Daugherty v. M-Earth of Alabama, Inc., 485 So.2d 1145 (Ala.1986). As was stated in Cordes v. Wooten, 476 So.2d 89 (Ala.1985): ‘It is elementary that the test of agency is the right of control, whether exercised or not, and that is a question for the trier of fact if the evidence is in dispute.’ For one to be an agent, the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished, or, in other words, not only what shall be done, but how it shall be done. Solmica of the Gulf Coast, Inc. v. Braggs, 285 Ala. 396, 232 So.2d 638 (1970). An agency relationship is not created when the employer merely retains the right to supervise or inspect the work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications and retains the right to stop work that is not properly done. Weeks v. Alabama Elec. Co-op., Inc., 419 So.2d 1381 (Ala.1982).
[[Image here]]
“... [Ajgency is determined by the evidence as a whole, and not necessarily by how the parties characterize their relationship.”
Brown, 504 So.2d at 246-47.
The supreme court concluded in Brown that the Lamar Circuit Court had erred in determining, as a matter of law, that Ott was an independent contractor. The supreme court expressly relied on the facts that
“Commercial Dispatch ... supervised Ott not just for the purpose of insuring the delivery of newspapers, but the delivery of newspapers within a reasonably short period of time[, that] Ott’s employment was subject to termination upon his failure to deliver the papers in such a mannerf, that] ... the cassette tape given to Ott by [Commercial Union’s district manager] contained detailed instructions on ‘how’ to deliver the newspapers along the route[, and that Ott was] ... under the constant supervision and control of Commercial Dispatch.”
Brown, 504 So.2d at 248.
In the present case, however, the undisputed evidence indicates that Johnson determined what time she picked up the newspapers for delivery and that the district manager only confirmed that the newspapers were picked up from The Decatur Daily’s office. Johnson testified that no one from TVPC had verified whether she had actually delivered the newspapers and that the only way TVPC would have known that she had missed a delivery was through customer complaints. The evidence indicated further that Johnson had exercised discretion as to the manner in which she executed her route, such as deciding from which direction she entered a parking lot and opting to return to her home mid-route to reload her vehicle with newspapers.
*1230 The supreme court also noted other evidence of an agency relationship between Commercial Dispatch and Ott that does not exist in the present case, e.g., that Ott “agreed not to distribute another publication or printed advertisement with The, Commercial Dispatch without obtaining the written consent of Commercial Dispatch”; that Commercial Dispatch “offered some life and accident insurance to its carriers, including Ott, on an optional basis at the carrier’s expense”; that “[t]he cassette tape given to Ott contained detailed instructions on placing newspapers either in ‘tubes,’ mailboxes, or driveways in accordance with the particular preference of certain customers”; that Commercial Dispatch required the newspaper-delivery persons to pick up the newspapers at a specific time; and that “Ott had authority from Commercial Dispatch to endorse and deposit or cash any checks made out to Commercial Dispatch.” Brown, 504 So.2d at 246-47.
Furthermore, we note that Brown was decided under the former “scintilla (‘any evidence’) rule, which requires that a summary judgment not be granted if there is any evidence supporting the position of the nonmovant.” Brown, 504 So.2d at 246. Thus, Commercial Dispatch had the burden of showing that there was no evidence of an agency relationship in order to secure a summary judgment in its favor. In the present case, however, the parties are subject to the current “substantial evidence” rule, which requires that Owen present substantial evidence of an agency relationship in order to defeat TVPC’s summary-judgment motion. Based on the foregoing, we conclude that the present case is distinguishable from Brown.
We next consider Jenkins v. Gadsden Times Publishing Corp., 521 So.2d 957 (Ala.1988). In Jenkins, the Etowah Circuit Court determined, as a matter of law, that Connie Chambers, a newspaper-delivery person, was acting as an independent contractor of the Gadsden Times Publishing Corporation (“the Gadsden Times”). On appeal, Jenkins argued that
“the following facts, taken from Chambers’s affidavit, create a scintilla of evidence that she was an employee of [the Gadsden Times], rather than an independent contractor:
“a. [The Gadsden Times] told her exactly what route to take, and which mailboxes to stop at;
“b. she never varied from that route;
“c. she took instructions from Marie Moon, her supervisor, whom she also referred to as her ‘boss lady’;
“d. Marie Moon, her ‘boss lady’ or supervisor was in ‘control’ of the rural route carriers;
“e. she was told by [the Gadsden Times] who the customers were and she never solicited customers;
“f. she was told by [the Gadsden Times] of any complaint by a customer and exactly how to correct the problem;
“g. she was restricted to certain delivery areas;
“h. customers paid her sometimes by checks made out to her and sometimes by checks made out to [the Gadsden Times], and she was authorized to endorse those checks made out to [the Gadsden Times];
“i. [the Gadsden Times] took out insurance on her and charged her for premiums;
“j. the insurance carrier was selected by [the Gadsden Times] and the insurance policy was carried in its name;
“k. [the Gadsden Times] paid her a set salary of $10 per month for delivery of a newspaper supplement on Wednesdays and that delivery was a required *1231 part of her continued employment -with [the Gadsden Times];
“1. instructions from her ‘boss lady,’ Marie Moon, were given by way of an oral tape recording, which told her how many papers to leave at each box and exactly where to stop and go, and without this tape she would have been ‘lost’;
“m. she said she was an ‘employee’ of [the Gadsden Times], in response to a question asked by the attorney for [the Gadsden Times];
“n. she did not know the customers’ names.”
521 So.2d at 958-59. Our supreme court determined that the Etowah Circuit Court had erred in granting the summary-judgment motion filed by the Gadsden Times because, it said, “[although there [wa]s substantial evidence to indicate that Chambers was acting independently of [the Gadsden Times], there is a scintilla of evidence to indicate that she was acting as the servant of [the Gadsden Times].” 521 So.2d at 959.
In the present case, although there was evidence presented indicating that Johnson had a set route along which she delivered newspapers and that the district manager monitored Johnson’s compliance with her contract, the facts as set forth in Chambers’s affidavit tending to show that Chambers was an agent of the Gadsden Times are not present in this case. Specifically, in the present case, Johnson was obligated by her contract to use her best efforts to solicit customers; there was no evidence indicating that TVPC had told Johnson how to correct any customer complaints; Johnson was not allowed to endorse checks made payable to TVPC; TVPC did not take out insurance on Johnson and charge her for premiums; TVPC did not pay Johnson a set salary for any delivery; TVPC did not specify how many newspapers Johnson was to leave at each newspaper rack; TVPC did not require Johnson to follow a certain direction in delivering her route; and Johnson was provided with the customer list for her route.
Furthermore, like Brown, Jenkins was decided under the former scintilla rule. In fact, the supreme court specifically stated in Jenkins that “there was a scintilla of evidence to indicate an employment relationship.” 521 So.2d at 959. In the present case, in which the burden on Owen was even greater, Owen produced less evidence of agency than was presented in Jenkins. Therefore, we conclude that Jenkins is distinguishable from the present case.
Finally, in Atchison v. Boone Newspapers, Inc., 981 So.2d 427 (Ala.Civ.App.2007), this court .affirmed a summary judgment, holding that Linda Atchison, a newspaper-delivery person, was an independent contractor for purposes of workers’ compensation coverage. This court set forth the following facts that were presented by Boone Newspapers, Inc., in support of its summary-judgment motion:
“The first contract, entitled ‘Independent Contractor Distribution Agreement Home Subscriber Delivery,’ provided that Atchison would be considered a self-employed independent contractor who contracted to deliver The Clanton Advertiser. The contract stated, in pertinent part:
“ ‘Both [Atchison] and the Clanton Advertiser fully and freely intend to create an independent contractor relationship under this contract. [Atchi-son], under this contract, has the right to control the manner and the means of delivery of newspapers to home subscribers. [Atchison] has the right to determine the equipment and supplies needed to perform delivery services under this contract, and [Atchi-son] shall bear all expenses associated *1232 with the purchase, operation and maintenance of equipment and supplies. [Atchison] has the right to hire employees of [her] choosing and to contract with others to fulfill [Atchi-son’s] obligations under this contract. [Atchison] shall have the right to engage in any other business, including the delivery of other newspapers.’
“The contract further provided that At-chison would deliver The Clanton Advertiser in a designated area. Under the terms of the first contract, Atchison would purchase the newspapers at 22 cents apiece and resell them to subscribers in her designated area. Atchi-son agreed to take delivery of the newspapers at the office of The Clanton Advertiser in Clanton and to deliver the newspapers in a safe, complete, and dry condition no later than 6:30 a.m. The Clanton Advertiser agreed to field any complaints from subscribers, but Atchi-son was afforded the discretion to determine the manner in which the complaint was to be resolved so long as it was resolved on the day the complaint was received. Atchison agreed to use her best efforts to increase the number of subscribers and to keep delivery complaints below one per every 1,000 newspapers delivered. Either party could terminate the contract for any reason by giving the other party 30 days’ written notice or could terminate the contract immediately for cause.
“The second contract, entitled ‘Independent Contractor Distribution Agreement TMC Delivery,’ contained basically the same language as the first contract; however, it concerned the delivery of ‘The Clanton Advertiser Extra,’ which Atchison agreed to purchase for 8 cents per copy and to deliver ‘within a reasonable time.’
■ “The companies also attached to their summary-judgment motion a 1099-Misc tax form indicating that Clanton Newspapers, Inc., had paid Atchison $2,027.11 in ‘nonemployee compensation’ for the year 2004 and had not deducted any payroll taxes for Atchison. The companies also attached several checks made payable to Atchison in 2004 and 2005 from a Boone Newspapers, Inc., account.
“The companies also submitted an affidavit from Michael R. Kelly, the president and publisher of Clanton Newspapers, Inc. In his affidavit, Kelly deposed that Atchison was an independent contractor of Clanton Newspapers, Inc., and that she had delivered The Clanton Advertiser and The Clanton Advertiser Extra. The affidavit averred that Atchison had no contractual relationship with Boone Newspapers, Inc. Kelly stated in his affidavit that Atchison had received the newspapers in order to deliver them by 6:30 a.m. and that Clanton Newspapers, Inc., did not control the methods or means by which she had delivered the newspapers or the manner in which she had performed her duties under the contracts. Kelly stated that Clanton Newspapers, Inc., had paid Atchison the difference between the wholesale price of the newspapers and the price it charged its subscribers, which equaled 10 cents per copy of The Clanton Advertiser and 8 cents per copy of The Clanton Advertiser Extra that she delivered. Kelly also stated that Atchison had received a hardship allowance in the amount of $250 in August 2004 and a hardship allowance in the amount of $300 in September and October 2004, based on the judgment of Clanton Newspapers, Inc.,_ regarding ‘the difficulty of delivering the total newspaper route.’ ”
Atchison, 981 So.2d at 430-31.
We conclude that the facts in At-chison are substantially analogous to those *1233 in the present ease. Owen attempts to distinguish Atchison from the present ease by pointing out that Atchison is a workers’ compensation case. We note, however, that, although Atchison is a workers’ compensation case, the law applicable to whether a person is an independent contractor or an employee is the same in a personal-injury case as it is in a workers’ compensation case. Compare Atchison, 981 So.2d at 431-32 (discussing the law applicable to whether a person is an independent contractor or an employee) to Brown, 504 So.2d at 246-47 (discussing the same).
Owens also argues that Atchison is distinguishable from the present case because in Atchison there was no evidence submitted in opposition to the summary-judgment motion. With regard to the lack of evidentiary submissions on the part of the nonmovant in Atchison, we conclude that, even considering the evidence in the light most favorable to Owen, there is not substantial evidence to support Owen’s position that Johnson was an employee of TVPC. The undisputed evidence indicated that Johnson and TVPC agreed that Johnson was an independent contractor; that Johnson contracted with TVPC to deliver newspapers by a certain deadline for designated routes; that Johnson determined the manner in which she performed her contract, including the time at which she picked up the newspapers, the exact direction she followed in delivering the newspapers, what vehicle and other equipment she used, what to wear, and how many newspapers to place in each newspaper rack; that Johnson was not paid a set salary but, instead, earned a profit based on how many newspapers were sold on her route; that there was no insurance or other benefits available to Johnson through TVPC; and that the district manager did not supervise Johnson but, instead, merely monitored Johnson’s compliance with her contract. We note that, although Johnson testified that Behand supervised her and could be considered her boss, whether a person is an independent contractor is not determined “necessarily by how the parties characterize their relationship,” Brown, 504 So.2d at 247, and that “[a]n agency relationship is not created when the employer merely retains the right to supervise or inspect the work of an independent contractor.” Brown, 504 So.2d at 246.
Based on the foregoing, we conclude that, like in Atchison, there was not substantial evidence presented indicating that Johnson was an employee of TVPC.
Owens also argues that the factors set forth in the Restatement (Second) of Agency and certain decisions from other jurisdictions support her position. We conclude, however, that there is sufficient binding authority to determine this case without considering the divided opinions from other jurisdictions and the factors set forth in the Restatement, which are merely persuasive authority. See, e.g., Phillips v. Smalley Maintenance Servs., Inc., 435 So.2d 705, 708 (Ala.1983); and Stone v. Mellon Mortg. Co., 771 So.2d 451, 456 n. 1 (Ala.2000).
Finally, Owens argues that the language of the trial court’s judgment indicates that it applied the wrong standard in determining whether to grant the summary-judgment motion. We conclude, however, having read and considered the entirety of the judgment, that the trial court properly applied the summary-judgment standard. See, e.g., Moore v. Graham, 590 So.2d 293 (Ala.Civ.App.1991) (noting that judgments should be read as a whole).

Conclusion

Based on the foregoing, we conclude that the trial court correctly determined that, as a matter of law, Johnson was not *1234 an employee of TVPC. Therefore, the trial court properly entered a summary judgment in TVPC’s favor.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.

. There was a separate "Training Check List" introduced relating to the home-delivery route.